BUTTS *vs.* COLLINS.

Where the *agent* of a defendant in an execution became the *receiptor* to the sheriff of the property of his principal, levied upon by virtue of such execution, and agreed with the sheriff and the plaintiff in the execution, that he would cause such property, consisting of yarn and other materials found in a factory, to be manufactured into flannels, and would furnish such materials as should be necessary for that purpose, the avails to be applied on the execution after satisfying his advances—and the agent accordingly made the necessary advances, caused the materials to be manufactured into flannels, and put them into the hands of a manufacturer to to be dressed, *it was held*, in an action by the manufacturer against the agent for work done, that the agent was not entitled to *set off* value the value of such flannels, although the maufacturer, after the flannels were dressed, had refused to surrender them to him.

A *receiptor*, it seems, may maintain *trespass* for goods taken from his actual possession by a wrongdoer; but whether he can bring *trover* or *replevin* —*quere.*

*It seems*, though under the statute of *set-off* of 1804 *unliquidated damages* could not be set off in an action of assumpsit in *courts of record*, that by the act of 1813, on the subject of set-offs, such demands were the subject of set-off; put that by the *revised statutes*, the law is restored as it was in 1801, and that *now* unliquidated damages cannot be set-off.

ERROR from the supreme court. Collins, in December, 1829, sued Butts in the *mayor's court* of the city of *Hudson*, and claimed in an action of *assumpsit* $125,69, for work done in dressing, as a manufactuer, a quantity of flannels. On the trial of the cause, the defendant admitted the demand of the plaintiff, and proved that he had put into the plaintiff's hands 98 *pieces of flannel*, to be dressed; that only 4 bales of flannels, consisting of 36 of the 98 pieces, had been returned to him; that the flannels averaged 48 or 49 yards per piece, and were worth two shillings per yard. Upon this evidence the defendant claimed that he was entitled to *set off* the value of the flannels which had not been returned, against the demand of the plaintiff, and to have a balance certified in his favor. Which claim was resisted by the plaintiff, on the following state of facts: On the 27th *August*, 1829, a quantity of *yarn* and *materials* found in a factory occupied, or which had then lately been occupied by Josiah J. Underhill, were levied upon

by the sheriff of Columbia, by virtue of an execution in favor of *Caleb Underhill*, against *Josiah J. Underhill*. Upon that occasion Butts became, as stated in the bill of exceptions, the *receiptor* to the sheriff for the *property* : but not for the *yarn*, i. e. the yarn not being seen when the first levy was made. On the 12th *September*, the *yarn* was pointed out to the sheriff at the factory, and it was then considered by all the parties interested in the property, as the best course to be pursued, to have the stock worked up into flannel ; and Butts, as receiptor, agreed to take the responsiblity of having it worked up and applied on the execution. The agreement with him was, that he was to attend to the working up of the yarn and unfinished materials *as overseer,* and *furnish* such things as were necessary, and be paid the expenses of manufacturing out of the avails, and the residue to be applied on the execution. Butts accordingly employed one *F. Andrew*, who manufactured the yarn and materials into flannels, making the same into 62 pieces, which were manufactured from yarn and materials which were in the factory at the time of the failure of Josiah J. Underhill, which happened in August, 1829, and which belonged to him before his failure, except about 100 weight of wool. These 62 pieces formed part of the 98 pieces put into the hands of the plaintiff to be dressed. One *Atwood* was asked as a witness, whether the four bales of flannels finished by the plaintiff and returned to the defendant were full as much as the 36 pieces which the defendant *owned* and the *stock which he furnished ;* he answered that they were certainly as much, and he thought more. The contract of the defendant with Atwood and with the the plaintiff were made in his *own name,* and not as the agent of Underhill. When, however, the defendant came to settle with Atwood, he avowed himself the agent of Underhill ; and previous to that time Atwood had received a letter from Underhill, dated 26th August, 1829, informing him that he had appointed the defendant his agent, and given him a power of attorney to transact his business; which letter was handed to Atwood by the defendant or a person in his employment. On the day of the sale of Underhill's property under the execution, the sheriff went with the defendant to the plaintiff to obtain the flannels ; the sheriff supposed the

flannels were liable to the execution, and broke open a door, but failed to find them. He testified, that in endeavoring to obtain the flannels on the execution, he acted under the defendant's direction, and that he understood that the object of the defendant in going with him to retake the flannels from the plaintiff, was to *save himself as receiptor* and *his expenses* in manufacturing the flannels. The *recorder* (the presiding officer in the mayor's court) charged the jury that it would be for them to inquire whether the defendant, in making the contract with the plaintiff, acted in his own right or as agent of another; that as he had contracted in his own name, without disclosing any agency, the plaintiff was bound to the defendant personally, unless he established the agency by clear and incontrovertible proof; that the claim of the defendant rested upon an express promise of the plaintiff to dress the flannels and deliver them to the defendant; and as they were not delivered, after being dressed, according to the contract, the defendant had a right in his own name to recover their value. He further charged them that as to the plaintiff's lien on the goods for finishing, it was a legal right which he might waive, and as the defendant had demanded the goods and the plaintiff had not delivered them, but had denied the defendant's right and claimed the right to keep them himself, and had expressly refused to deliver them, and had them not at the stipulated place ready for delivery, he could not now be permitted to hold them or protect himself under the pretence of his lien, provided the jury should be of opinion that he held the property for other reasons than to secure his pay for the dressing. The facts upon which this part of the charge was founded are not set forth in the bill of exceptions. The recorder further charged the jury, as to the claim of *set-off*, that the demand of the defendant was a demand arising on express contract, capable of being easily liquidated by calculation, and therefore in the judgment of the court allowable. The jury found a verdict for the *defendant*, and certified a balance in his favor of $462,31, on which the mayor's court rendered judgment. The *plaintiff* having excepted to the charge of the recorder, sued out a writ of error, removing the record into the supreme court, where

ALBANY,
Dec. 1834.

Butts
v.
Collins.

the judgment of the mayor's court was *reversed* and a *venire de novo* awarded. See opinion delivered in the supreme court, 10 *Wendell*, 399. Whereupon the *defendant* sued out a writ of error, removing the record into this court. The cause was argued here by

*A. L. Jordan*, for the plaintiff in error.

*S. Stevens*, for the defendant in error.

The following opinions were delivered :

By the CHANCELLOR. In the case of *Reab* v. *M'Alister*, in this court, 8 *Wendell*, 112, I stated the reasons which had induced me to suppose that the legislature, in the revision of 1813, intended to change the law of set-off in courts of record, so as to authorize the setting off of unliquidated demands arising on contract, to the same extent that such set-offs were allowed in justice's courts. That by adopting similar language to that which had previously existed in the justice's act, and which the supreme court had decided was sufficient to authorize the set-off of an unliquidated demand in a justice's court, the legislature intended the general provision as to set-offs in courts of record, contained in the revised act of 1813, should receive the same construction—and I have not seen any thing since to induce me to alter the opinion which I then expressed. That case, however, was disposed of by this court on other grounds. The question as to the right to set-off an unliquidated demand, under the act of 1813, which remained in force when this suit was commenced, in December, 1829, is therefore still an open question here. But if a majority of this court shall concur with me in the conclusion at which I have arrived upon other parts of this case, it will not even now be necessary for us to give a construction to the act of 1813 ; and it is hardly probable that another case will ever arise in which a decision of that question can become necessary for the determination of the court. It will be impossible, however, to reverse the judgment of the supreme court, unless a majority of the members of this court should arrive at the conclusion

that an unliquidated demand, arising on contract, could be set off under the act of 1813, as the demand which the defendant was allowed to set off in the mayor's court was an unliquidated demand, which was not the subject of set-off under the act of 1801. Neither could it be set off under the provisions of the revised statutes, which were intended to be in accordance with the decisions under the act of 1801, and the English statutes of set-off. *See Revisers' note to ch. 6, of pt. 3, p. 17.*

Nor do I consider it necessary in this case to decide what is the precise nature of the possession of a mere receiptor of goods taken by the sheriff upon an execution, while such goods remain constructively in the custody of the law. He has not such a general or special property in the goods as will enable him to recover in *trover* or *replevin,* in which actions the property in the goods is drawn in question. In trover or replevin, it is a good defence to the action that the plaintiff has neither the general or special property in the goods ; but in an action of *trespass,* a bare possession is sufficient to enable the plaintiff to recover against a wrongdoer, who takes the property out of his possession without authority. *Cook,* v. *Howard,* 13 *Johns. R.* 276. *Demick* v. *Chapman,* 11 *id.* 132. *Schermerhorn* v. *Van Valkenburg, id.* 529. *Aiken* v. *Buck,* 2 *Wendell,* 466.

As I understand the evidence in this case, Butts was *the agent of Underhill,* the defendant in the execution, and as such agent, agreed with the sheriff to have the manufacture of the goods completed before the sale upon the execution. It is evident also, that neither the sheriff or the plaintiff in the execution, or those for whose benefit the judgment was confessed, ever intended to relinquish the lien of the execution upon the goods. The sole object of the arrangement appears to have been to prevent a sacrifice of the property, which must have occurred if it had been sold in its unfinished state. For this purpose the defendant, acting as the agent of Underhill, against whom the execution issued, undertook to have the materials levied on, manufactured into flannels, which were then to be sold on the execution, and the avails, after satisfying the defendant for such expenses as he had personally incurred or become liable for in the finishing of the

flannels, were to be applied by the sheriff on the execution. Butts was, therefore, acting as the mere agent of the sheriff, under this arrangement, in making the contract with the plaintiff for finishing the flannels, although the fact of such agency does not appear to have been disclosed to Collins at the time such contract was made. The defendant may, therefore, have made himself liable to the plaintiff for the finishing of the flannels, (and he had undoubtedly made himself liable to *Andrew*, by an express agreement to compensate him for his services in manufacturing the same.) This liability, however, gave him no lien upon the flannels as against his principal, the sheriff, but merely a right to be reimbursed out of the proceeds of the sale. The sheriff, therefore, is the proper party to bring the suit against Collins, upon his undertaking to finish the flannels and to deliver them at the place designated; and the present defendant cannot set off that claim against a debt due from him in his own right. It is only where the agent has a lien upon the property sold by him, or has a commission *del credere*, that he has a right to sue in his own name on a contract made for his principal, or to set off a demand due to his principal against his own private debt. The set-off in this case, was, therefore, improperly allowed; and the judgment of the supreme court, which reversed that of the mayor's court, should be affirmed.

By Mr. Senator MAISON. It is contended that Butts was *merely* a *receiptor*, servant, agent or overseer, or a mere naked depositary or bailee in this matter; that he has not such an interest in the flannels as would authorize him to maintain any action, either for an injury done to them, or on a contract concerning them, and that such action could only be maintained in the name of the sheriff, his principal, and that therefore he has no right to *set off*. I cannot view this case in that light. By the contract, which is supported by a consideration of mutual promises, and the expenditure of means and labor in converting the raw material into a fabric, Butts became vested with a right and interest in the property, beyond what any receiptor, servant or agent as such has; he became responsible to the sheriff and the parties in interest, that the

raw material should be manufactured into flannel in a skilful and workmanlike manner; that he would, at his own expense, furnish all things necessary to the manufacturing the flannel, and when manufactured, that the property should be applied on the execution, after paying him for his labor and disbursements. Collins was employed by Butts, not by the sheriff, nor by his directions, nor by the parties in interest in the execution. A mere servant, it is held, cannot maintain trover, not only because he has no property in the goods, but because his possession is the possession of his employer, who alone can maintain the action ; but it is otherwise as to a carrier, bailee for hire, or trustee, or any other person who is responsible to his principal. Such person, by reason of his responsibility, has a special property, and may maintain the action. *1 Ch. Pl.* 153. 2 *Saund.* 47, *b. c. d.* 1 *East,* 244. 4 *id.* 214. 1 *Ld. Raym.* 275. 1 *Salk.* 290. *Cro. Eliz.* 819. 9 *Moore,* 334.

Butts, in performance of his contract, employed Martin and Andrew, and, through Martin, Collins, to work upon these flannels, to each of whom, it is admitted, he became and was personally responsible for their labor ; but it is contended, and so it is viewed by the supreme court, that such personal responsibility accrued, because Butts did not disclose the name of his principal. Who is the *principal,* and where is the evidence of *agency ?* This idea of agency seems to be based upon the testimony of the witness Andrew, who testified that when he called upon Butts for his pay, Butts presented an account of J. J. Underhill against him, and wished to apply his labor to that account, and told him he was agent for Underhill. The supreme court apply this remark of Butts as to his agency, to the manufacturing of the raw materials into flannel, under the contract he made with the sheriff and the parties in interest in the execution. I do not so understand his testimony. Underhill left Hudson and moved to Auburn in May, 1829, and failed in August therafter. After his failure, he sent to Butts his unsettled accounts for collection, and among them an account against Andrew, and gave to Butts a power of attorney to settle his unfinished business. Because Butts was the agent of Underhill for the purposes men-

tioned, it is not thence to be inferred that he was acting under that agency in the manufacturing of these flannels, which was undertaken by him under an express contract, not only with J. J. Underhill, but also with the sheriff and the plaintiff in the execution. There was no merging or extinction of this contract by reason of Butts' acceptance of a general agency, nor was he in any manner released from his responsibilities to the sheriff and the plaintiff in the execution; his relationship, as one of the contracting parties in the manufacture of the flannels, and as agent for Underhill, in the settlement of Underhill's unfinished business, is not in collision nor incompatible.

It is objected that there is no evidence that Butts furnished the one hundred weight of wool, which was used in the manufacturing of the flannels, and which did not belong to Underhill. The fair inference from the case is, that he did furnish this wool by himself, or by Andrew, his workman. Underhill had become insolvent, and had moved away, and no one was under obligatins to furnish materials to complete the manufacturing of these flannels, or authorized to do so, but Butts; and there is no pretence or evidence in the case that any other person did. Martin testifies, that *some* of the flannels were made of the wool left by Underhill, and Andrew testifies that the 62 pieces in question were manufactured from yarn and materials which were in the factory at the time of Underhill's failure, and which belon ;ed to Underhill before his failure, except about one hundred weight of wool. The question put to Andrew upon the trial, by the counsel of Collins, "were the four bales of flannels that were finished by Collins, and returned to Butts, full as much as the thirty-six pieces which Butts owned, *and the stock he furnished,*" indicates that Butts furnished some stock, and there is no pretence that he furnished any other or additional quantity of materials or stock than this one hundred weight of wool; and indeed it has been contended here, that in the four bales which had been delivered to Butts, there was an excess of 592 yards more than was contained in thirty-six pieces which belonged to him, and that so he was compensated for the wool he furnished. I am satisfied Butts furnished the one hundred weight of wool.

Whether he had been compensated for the wool or not, is not a question with which Collins has any concern ; that remains to be settled between Butts and the Sheriff, and the parties in interest in the execution ; nor can the question have any influence in determining the character of Butts in this transaction, or his interest in the property in question, as between him and Collins.

On examining the cases to which reference has been made with a view of fixing the character of Butts as a *mere receiptor* I do not find in any one of them a case where the receiptor was in fact any other than a mere servant, or a *naked depositary*. The receiptors in those cases were not to use the property put into their charge ; they were not to be paid any thing for their trouble in taking care of it ; they were not at liberty, nor under contract to change its character, with a view of making it more valuable ; they were under no obligation to take greater care of it than of their own property, and they were responsible only for gross negligence. See the cases of *Ludden* v. *Leavitt,* 9 *Mass. R.* 104, *Commonwealth* v. *Morse,* 14 *id.* 217, *Barker* v. *Miller,* 6 *Johns. R.* 195, *Edson* v. *Weston.* 7 *Cowen,* 280, *Norton* v. *The People,* 8 *Cowen,* 137, *and Philips* v. *Hall,* 8 *Wendell,* 613. The principle settled in these cases is, that a receiptor is a mere servant or agent of the sheriff, and having no property or interest in the goods, cannot maintain trover for them ; and yet his promise to return, or deliver the goods to the sheriff when demanded, is founded on a good and sufficient consideration, is obligatory upon him, and may be enforced. Were there no adjudged cases holding a different doctrine, I should feel myself bound by the above decisions ; but there are such cases, which acquit the law of the absurdity and injustice of holding the receiptor liable to the sheriff for the value of the goods, and yet refusing him its aid or protection, in enabling him to recover the value of the goods from the person who obtains the possession—to declare him responsible, and yet powerless in the protection of his possession, by which that responsibility is to be redeemed. It was conceded on the argument that a receiptor could maintain *trespass* against a stranger, for interfering with or violating his possession, and the case of *Burrows* v.

*Stoddard,* 3 *Conn. R.* 160, was deemed decisive of that point ; and yet it is gravely asserted that if the receiptor voluntarily part with the goods, for a limited time, or for a specific purpose, he is remediless ; he cannot maintain *trespass,* for there has been no tortious taking, and *trover* can be maintained only by the sheriff. It appears to me there is more of technicality than good sense in this distinction.

*Trover* and *trespass* are, in a variety of cases, concurrent remedies, both being founded on a former possession. 1 *Ch. Pl.* 169. Tresspass is the appropriate remedy, where the taking has been forcible, or tortious, or without the consent of the possessor. Trover is the appropriate remedy, where the party has lost his chattels, and the finder or those holding under him refuse to deliver them ; or where a party has parted with his possession to another voluntarily for a limited time, or for a particular purpose, and that other afterwards refuses to redeliver. In the one case a jury would in many instances be justified in awarding smart money, an amount larger than the value of the goods and interest, by way of punishment and an example for a wilful wanton violation of right; while, in the other, only the value of the goods and interest from the time of the conversion would be awarded, on the ground that the party came rightfully into the possession. Trover is, in some cases, a possessory action, and in others an action for the trial of the title to the property in controversy.

I hold the rule to be, that a *receiptor* can maintain *trover* against all persons, except the officer from whom he received the property—his possession gives him this right—and that such has been considered the law, not only in this state, but also in *Massachusetts,* by well considered adjudications, made both before and since the decision of the case of *Ludden* v. *Leavitt,* 9 *Mass. R.* 104, which is relied upon as settling a different rule. In the case of *Waterman* v. *Robinson,* 5 *Mass. R.* 303, which was before the case of *Ludden* v. *Leavitt,* it appears that the household furniture of one Lucas was seized by a messenger from the commissioners of bankruptcy, who delivered them to the plaintiff, taking his obligation to keep them safely and to deliver them on demand. The plaintiff placed the goods in the possession of Lucas' wife, who was

the plaintiff's daughter, for the purpose of house-keeping, she and her husband living together. The defendant, as deputy sheriff, afterwards attached them as the property of Lucas, and the plaintiff brought replevin. Chief Justice *Parsons* said, *trover* may be maintained by him who has the possession, but *replevin* cannot be maintained but by him who has the property, general or special. Admitting the commission and the proceedings under it to be regular, what property had the plaintiff in the goods; the general property was in the commissioners until the assignment, and then in the assignee; the messenger, if any person, had the special property, and not the plaintiff, who had no interest in the goods, but merely had the care of them for safe keeping; if his *possession was violated*, he might maintain *trespass* or *trover*, but he had no special property by which he could maintain replevin, in which the question is not of possession, but of property, although possession may be *prima facie* evidence of property. This case must have been overlooked by the court of Massachusetts, in the consideration of the case of *Ludden* v. *Leavitt;* it was not adverted to, nor was any case cited in support of the doctrine there maintained. *Dillenbach* v. *Jerome 7 Cowen*, 294, has been cited in support of a contrary doctrine, but in my judgment without success, for the reason that Dillenbach *never had the possession* of the property. To maintain trover, the party must have had possession, the property, or the right of property; and Dillenbach had neither. A very recent case in our supreme court goes the whole extent in support of the view of the law suggested. I allude to the case of *Duncan* v. *Spear*, 11 *Wendell*, 54. This was trover for a span of horses; the plaintiff proved that on the 1st February he had *possession* of the horses; the defendant proved that anterior to that time one Loman Reid had *possession ;* the plaintiff then proved that the horses were on the 2d February levied upon by a constable, by virtue of an execution in his favor against Reid, and he purchased them at constable's sale. It was insisted that the sale could give no title, as the execution was void, having been issued without the oath the law required. Mr. Justice Sutherland, in delivering the opinion of the court, held that the action of trover could be main-

tained; the plaintiff proving the horses in *his possession* was sufficient to put the defendant upon showing by what right or title he holds them; and that, even if the execution and sale were void, that cannot affect the character or legal consequences of his *prior* possession. To the same effect is the case of *Daniels* v. *Ball & Brown*, in a note to this last case, it being there also expressly held, that mere naked prior possession was sufficient to maintain trover against a stranger.

The case of *Eaton and another* v. *Lynde*, 15 *Mass. R.* 242, (which was after the case of *Ludden* v. *Leavitt*,) in its principal features, is like the case at bar. In that case, Slater & Co. delivered a quantity of yarn to the plaintiffs, upon an agreement that they should procure it to be wove into cloth, and for which they were to be allowed a commission. The plaintiffs delivered the yarn to one Benson, to weave for a stipulated price, which the plaintiffs were to pay in goods from their store. After Benson had wove the yarn into cloth, a creditor of Benson attached it as his property. It was there contended that the plaintiffs had no property at all in the yarn, or in the cloth made therefrom, and the only question submitted to the court was, whether the plaintiffs had such a property in the yarn as would warrant trover; and the court were of opinion that, as they had received the yarn and had undertaken to have it woven into cloth upon a commission to be paid them by Slater & Co. the special property was in the plaintiffs, and gave judgment accordingly. If the plaintiffs in the case last cited had a special property, then much more has the plaintiff Butts in this case a special property; for, in addition to the undertaking to convert the yarn into cloth or flannel, Butts had agreed with the parties in interest in the execution, both plaintiff and defendant and the sheriff, that he would furnish whatever stock should be necessary to finish the manufacture of the flannels; and he did accordingly furnish one hundred weight of wool, which went into the mass of raw materials out of which the flannels were manufactured. The undertakings and responsibilities of Butts, assumed upon sufficient consideration, and which are never assumed by a mere servant or receiptor, invested him with rights and interests which no mere receiptor ever

can have. He has a lien on the property to the value of the stock he furnished ; his ownership therein, equitably if not legally, extends to that amount, and for the labor bestowed on the manufacturer. Who has ever heard of a mere receiptor, in the character of a servant, having liens on property intrusted to his custody for safe keeping ? and yet, in this case, Butts' claim on the goods for the stock he furnished and for his labor and expenses is to be satisfied, before there can be any application of the goods to the execution. The deputy sheriff testifies that Butts was to be paid the expenses of manufacturing, out of the avails, and *the residue* was to be applied to the execution. This arrangement between the parties is analogous to that of a bailment, *locatio operis faciendi*, where work and labor, care and diligence, are to be bestowed on the thing delivered for a pecuniary recompense ; where the undertaker would be responsible, not only for the materials themselves, (unless they have been lost by inevitable accident or irresistible force, see *Brown* v. *Cook*, 9 *Johns. R.* 361,) but also for any damage which might be sustained, by reason of any want of care or skill in the manufacturing of them into flannel. 4 *Kents. Comm. 2d. ed.* 586, 588, 9.

With a view or further testing the right or interest of Butts in these flannels, it is contended that Collins, in an action of *trover* against him, could plead that the *title to the property was in another person.* It has already been shown that trover is a possessory action, and can be maintained by him who had the mere possession. But let us inquire. Should Collins plead the title of the property to be in J. J. Underhill, he would be met with the answer, that his ownership was suspended until the execution was satisfied, and the sheriff's title is paramount so long as the execution remains unpaid, or that he, Butts, holds and claims under Underhill. Should Collins plead title in the sheriff, it is Butts that holds under the sheriff, as well as under Underhill, in virtue of his contract. Collins cannot be admitted to allege or prove title to these flannels in another ; he received the property of Butts, under a contract made with him, through Andrew, Butts' agent, to manufacture it into flannels. The act of receiving the property, under the circumstances, is an admission on the part of Collins that

the property in the goods was in Butts, and in no one else. I apply to this case the language of Chief Justice Thompson in *Kennedy* v. *Strong*, 14 *Johns. R.* 131: "The property was taken in possession by the defendant as the goods of the plaintiff, and I do not see why the defendant ought not to be estopped by such admission from denying the plaintiff's title, as much in a chattle as in lands. It would be unjust to permit the defendant to set up a title in a third person, after having acknowledged the plaintiff's right and received the goods as his. It would operate as a surprise upon the owners of goods, to permit their agents or factors to set up such a defence." It has been expressly decided, in the cases of *Duncan* v. *Spear* and *Daniels* v. *Ball & Brown*, before referred to, that a defendant in trover cannot set up title in another, unless he holds under that title. In the first case Mr. Justice *Sutherland* held that the defendant in trover could not set up property in a third person, without showing some claim, title or interest in himself, and that the defendant in that case could not set up the title of Reid, with which he had no connection; and Mr. Justice *Woodworth*, in the second case, also expressly held, that a defendant in trover cannot be permitted to prove the property to be in a third person, unless he shows some claim, title or interest in himself, derived from such person.

The supreme court, in the case at bar, say, there is no other interest in personal property, except a *general* and *special* property. This is conceded. It is also urged in the argument here, that a special property in goods is indivisible. Granted; but the special property may be at one time in one person, and at another time in another person. Thus, the general owner puts his goods into the possession of A. for use, and afterwards to be transported to a distant place. A. has the special property. He sends the goods by B., a common carrier, by land; B. has now the special property. B. sends the goods by C., a common carrier, by water; C. has now the special property, and he loses the goods, converts them to his own use, or makes any other wrongful disposition of them. Is not C. liable to B., and B. to A.? Most unquestionably; and such liability exists upon no other principle than as between B. and

C., (as far as C. is concerned,) B. is *quasi* general owner, and C. shall not be permitted to question his title. For the like reason as between A. and B., A. is *quasi* general owner, and B. shall not be permitted to question his title, the property having been received by implication of law as the property of him who delivered it. The general owner, if he has a right of immediate possession, has a right of action against C. as well as B.; they may both sue, and he who first gets judgment has the better right, for such judgment is a bar to an action by the other. 1 *Ch. Pl.* 48, 154. Once more. Let us suppose that by some turn of good fortune, J. J. Underhill had, before the flannels were finished, become enabled and did pay to the sheriff the amount of the execution; the sheriff's lien in that event would be gone, and he could not maintain an action against Collins. I hold the sheriff has at no time been divested of the lien which the law creates in his behalf, in favor of the plaintiff in the execution; nor will the law permit his lien thereon to become divested without his consent, until the execution be satisfied. It is evident the parties understood that the lien was not suspended, as Butts applied to the sheriff to retake the flannels. Shall J. J. Underhill be permitted to sue and recover in violation of his agreement, and in the face too of the law, which gives to Butts a lien on the goods by reason of his right to sue for the labor and expenses in manufacturing them—thus stamping the law with the absurdity and injustice (which cannot be sanctioned) of declaring a lien, and yet authorizing a procedure which has the direct tendency of depriving the party of his lien? Butts has a clear and unquestionable right of property in these flannels, but to what extent remains to be settled between him and his employers. I am well satisfied that Butts could maintain trover against Collins for these flannels, and that Collins should not be permitted to question his right to a recovery.

The remaining question is whether Butts can legally set off his claim to the flannels, in an action for work and labor, brought by Collins against him. It is a well settled rule, that a demand sounding in tort cannot be set off to a demand sounding in contract, and *vice versa*. It is also well settled,

that in a variety of cases the plaintiff may waive the tort and sue in contract, and *vice versa ;* he has an election of action. Case and assumpsit are oftentimes concurrent remedies. Lord Ellenborough, in *Covett* v. *Radnidge,* 3 *East,* 70, obsrrves : " There is no inconvenience in suffering the plaintiff to allege his gravamen, as consisting in a breach of duty, arising out of an employment for hire, and to consider that breach of duty as tortious negligence, instead of considering the same circumstances as forming a breach of promise, implied from the same consideration of hire." Not only in cases of implied, but also in cases of express contracts, if they create a duty, *case* will lie ; for although there be an express contract, a party is not bound to resort to that contract—he may declare on the tort, and say that the party has neglected his duty. *Bayley, J., in Burnett* v. *Lynch,* 5 *Barn. & Cress.* 605. *See also Dickson* v. *Clifton,* 2 *Wils.* 319 ; *Mart* v. *Goodson,* 3 *id.* 348 ; *Burtherton* v. *Wood,* 3 *Brod. & Bing.* 54. So where a defendant has been guilty of a tortious neglect of duty, the plaintiff may waive the tort and rely upon the circumstances as forming a breach of promise, implied from some consideration of reward. *Govett* v. *Radnidge,* 3 *East,* 70, *Edmeads* v. *Newman,* 1 *Barn. & Cress.* 418. *Morgan* v. *Palmer,* 2 *id.* 735. *See also Orange Bank* v. *Brown,* 3 *Wendell,* 162. *Case* is the most usual form of action by the master for enticing away his apprentice, yet the tort may be waived, and assumpsit brought for the work and labor of the apprentice. Mansfield, Ch. J., with great propriety, remarked, " It is not competent for the defendant to answer, that he obtained that labor, not by contract with the master, but by wrong, and that therefore he will not pay for it." *Lightly* v. *Clouston,* 1 *Taunt.* 112. *Foster* v. *Stewart,* 3 *Maule & Selw.* 191. *Eades* v. *Vandeput,* 5 *East,* 39, *n. See also Lloyd* v. *Brewster,* 4 *Paige,* 537. Butts has therefore an election of actions against Collins ; he can maintain trover or assumpsit, and in the latter action recover the value of the flannels under the common counts for money had and received or for goods sold. *Hill* v. *Perrott,* 3 *Taunt.* 274, was assumpsit for goods sold ; the facts were, that goods to a considerable amount were looked out to be delivered to one Da Costa, for which the defendant

undertook to accept a bill at six months, to be endorsed by Da Costa. The goods were delivered to Da Costa, and afterwards were found in the defendant's possession. The whole was a swindling transaction, in which Da Costa was a mere instrument. Da Costa was insolvent, and the defendant having become a gurrantor for him, assisted him to buy the goods, which were, the moment after, made over to himself for his own indemnity. The plaintiff having failed to prove the special count as laid in his declaration, the only count that would serve him was *indebitatus assumpsit*, upon which he obtained a verdict. Best, serjeant, moved to set aside the verdict, on the ground that there was no contract of sale between the defendant and the plaintiff; but the court held that the law would imply a contract to pay for the goods, from the circumstance of their having been the plaintiff's property, and having come to the defendant's possession, if unaccounted for; and he could not be permitted to account for the possession by setting up the sale to Da Costa, which he had himself procured by the most nefarious fraud, because no man must take advantage of his own fraud ; therefore *indebitatus assumpsit* lay for the goods, and the verdict could be supported; and they refused the rule. To the same point, see *Abbotts* v. *Barry*, 6 *Com. Law R.* 157. So in the case of *Longchamp* v. *Kenny*, 1 *Dougl.* 137. The plaintiff was a waiter at one of the subscription houses in London, of which the defendant was master. Each of these had received from Mrs. Cornelys a number of masquerade tickets to dispose of, for which they were respectively to account after the masquerade, by paying the value or returning the tickets. Kenny got possession of one of the tickets which had been delivered to Longchamp. Longchamp told Mrs. Cornelys' agent that Kenny had had one of the tickets, and he must pay for it. Kenny refused to pay the agent. Longchamp being threatened with arrest, paid five guineas, the value of the ticket, and then sued Kenny in assumpsit. The declaration contained counts for money had and received, money paid, and money lent. The action was held well brought. Lord Mansfield said, "If the defendant sold the ticket and received the value of it, it was for the plaintiff's use, because the ticket was his." Ashhurst

and Buller, justices, concurred, and they refused to set aside the verdict, which the jury said they found expressly for the ticket. There is no evidence in this case that Butts had paid the sheriff the value of the flannels. That however can make no difference; it is sufficient that he is liable to pay. *Bullock* v. *Lloyd*, 12 *Com. Law R.* 53. Surely if in those cases an action of assumpsit could be maintained, much more can it be maintained by Butts, where the liability of Collins accrues not by inference of law, but in virtue of an express contract between them; and if *indebitatus assumpsit* would lie, then is his claim a matter of set-off.

It is however objected that Butts could not be allowed his *set-off*, because he could recover beyond the value of the flannels; and so the demand was unliquidated. This objection was made upon the assumption that Butts' only remedy against Collins, if any he had, was either in *trespass* or by a special action on the contract. In assumpsit, the value of the flannels only are recoverable. Lord Mansfield, in delivering the opinion of the court in the case of *Lindon* v. *Hooper*, 1 *Cowp.* 419, remarked of the case of *Feltham* v. *Terry*, (a manuscript case,) that it was for goods taken in execution, and sold under a warrant of distress upon a conviction. The conviction was quashed, consequently there could be no justification. The plaintiff, by bringing his action for money had and received, could only recover the money for which the goods were sold. But if trespass had been brought, the plaintiff might have recovered damages far beyond the money actually received from the sale of the goods. And Mansfield, chief justice, in *Lightly* v. *Clouston*, above cited, encouraged the election of suing in assumpsit, rather than in tort; observing that the practice is beneficial to the defendant, because a jury may give in damages for the tort a much greater sum than the value of the goods. It is well settled that uncertain *unliquidated damages* cannot be set off to a demand certain; nor a demand certain to a claim for unliquidated damages; nor unliquidated damages against unliquidated damages. But what are uncertain, unliquidated damages? They are such as rest in opinion only, and must be ascertained by a jury, their verdict being regulated by the peculiar circumstances of each particular case; they

are damages which cannot be ascertained by computation or calculation—as, for instance, damages for not using a farm in a workmanlike manner ; for not building a house in a good and sufficient manner ; on warranty in the sale of a horse ; for not skillfully amputating a limb ; for carelessly upsetting a stage, by which a bone is broken ; for not making repairs to a dwelling-house ; for unskillfully working the raw materials into a fabric ; and other cases of like character, where the amount to be settled rests in the discretion, judgment or opinion of the jury. *Hewlet* v. *Strickland*, 1 *Cowp.* 56. *Freeman* v. *Hyatt*, 1 *W. Black*, 394. *Weigall* v. *Waters*, 6 *T. R.* 488. *Livingston* v. *Livingston*, 4 *Johns. Ch. R.* 287. *Hepburn* v. *Hoag*, 6 *Cowen*, 613. In these and like cases, there is no data given for computation ; nor can the damages be ascertained by any mode of calculation. It is otherwise as to the amount due on a note, or on a merchant's account, or for work, labor and services, or for a yard, a piece or a bale of flannel ; the damages in such cases can be readily ascertained by calculation. The claim of Collins against Butts, for his work and labor in manufacturing the flannels, and so the claim of Butts against Collins for the flannels, can be ascertained by arithmetical calculation ; there is nothing resting in mere opinion, judgment or discretion. I have no doubt of the legality of the set-off made by Butts and allowed by the jury for the flannels. There is nothing in the case, nor is it pretended that the jury allowed too much or too little for the labor of Collins, or that the amount allowed for the flannels was either more or less than they were worth. Set-offs are to be encouraged ; they lessen the amount of litigation, by preventing circuity of action ; there is no reason nor propriety in driving these parties to cross-actions, and to compel the claims to be settled in two suits, when full and equal justice can be awarded to each of them in one suit.

I do not think there is any thing in the objection that there was no evidence that the flannels had been finished, or that Collins had been satisfied his lien for manufacturing them ; it is to be inferred that the flannels had been finished. There is testimony in the case showing that Butts and the deputy sheriff went to Collins to retake the flannels ; the deputy sher-

ALBANY,
Dec. 1834.

Butts
v.
Collins.

ALBANY,
Dec. 1834.

Butts
v.
Collins.

iff, acting under the direction of Butts in endeavoring to retake them on the execution, broke open Collins' door, but failed to find them. The case is very loosely drawn throughout; it does not even set forth whether Butts plead or gave notice of set-off, yet have the counsel argued the case in the supreme court and here, and the supreme court has passed upon the case as though the set-off had been properly pleaded, or a proper notice given under the general issue. The case does not state expressly that the flannels were finished, but the fair inference that they were, and had been removed. No reason nor motive is assigned for their removal (and it is not probable they were removed) before they were finished. It is stated as a fact proved, in the charge of the recorder to the jury, that the goods were demanded by Butts, and they were not delivered ; that Collins denied Butts' right to to them, and claimed the right to keep them himself, and expressly refused to deliver them. I do not consider the exceptions taken, to be taken to the facts stated to have been proved, but to the law charged by the recorder as applicable to the facts ; to wit, 1. That Collins' lien on the goods for finishing, was a legal right which he might waive ; and 2. That he, Collins, could not be permitted to hold the flannels, or protect himself under the pretence of his lien, provided the jury should be of opinion that he held the property for other reasons than to secure his pay. That part of the bill of exceptions in which these questions are presented, has not been discussed, from which an acquiescence in this part of the charge is presumed. I have not been able to discover any thing in this case to justify an interference with the verdict, and must therefore vote for a *reversal* of the judgment of the supreme court.

On the question being put, *shall this judgment be reversed?* the court divided—*ten* members voting in the *affirmative,* and *thirteen* in the *negative.* Whereupon the judgment of the supreme court was *affirmed.*