By the Court, Cowen, J.
Whether the defendant purchased the wheat for himself or as agent of Bogert, was a *238 question óf fact for the referee; and the report should not be set aside as being against the weight of evidence ip this respect.
The other question is, whether the plaintiffs were joint owners of the wheat. There is no doubt that Edward Putnam might sell to the other two Putnams any share of the interest' he held, which he might think proper; and there was sufficient evidence that he did sell to them such an interest as made them tenants in common with himself in the wheat in question. Edward Putnam and Melendy were the occupiers. They arrang ed that Edward Putnam should take two-thirds of the products to be divided; and, by the sub-contract, Edward let in the two youngqj; Putnams to two-thirds of his share. The agreement was, that they were to work so and so, and “ each have and be entitled to one third of his, said Edward’s, share,” &c, There is evidence on which the referee might say there was a foil performance by all the contractors and sub-contractors. Every thing seems, as between them, to have gone on harmoniously.
It is said, that Edward Putnam had no right to let in two additional partners, without the consent of all four of the original contractors. That is true, if they were partners. One partner cannot receive another into the firm without the consent of all. (Kingman v. Spurr, 7 Pick. 235, 237, 8. Murray v. Kneeland, 14 John. Rep. 318, 322.) Independently of Collins and Farnam’s (the owners) consent, the two sub-contractors, S. S. and H. L. Putnam, would have become partners, only as between themselves, and Edward Putnam. (Ex parte Barrow, in the matter of Slyth, 2 Rose’s Cas. Bankruptcy, 252, 4, 5. Colly. on Partn. 3, Am. ed. of 1839.) But there was evidence from which the referee might infer the assent of the other contractors. No doubt all must have known of the sub-contract, and all have chosen finally to adopt it, by joining in this action for the price of the wheat. (Vid. Maule v. Duke of Beaufort, 1 Russ. Ch. Rep. 349; and 7 Pick. 238, 9.)
So far, ,1 have assumed that the original contract, under *239 which the farm was to be worked, created a partnership between the parties; but it did not. It looked merely to the ownership of the products, and not to a sale. We shall see in the sequel that the parties concerned were all tenants in common of these products; but, in effect, it was certainly not more than a joint purchase. Had there been a provision for a joint sale, or joint commercial dealing in the products of the farm, or in carrying it on, it might have been different. (Colly, ut supra, 23, 303.) But there was not. Even a joint purchase of personal property does not make a partnership. (Colly, on Partn. 8 a, 10, 11, 12, ed. of 1839.) Such a purchase is said to create only a tenancy in common. (Jackson v. Robinson, 3 Mason, 138, 141.) But this is even less. It was, in effect, that one side should occupy the farm, and divide the crops, taking their share as a compensation for their labor. An agreement by two, to perform a job of work, the compensation money to be equally divided, does not make a partnership. (Colly, ut supra, 12.) Here was to be a division of the gross earnings of the farm; and in such a case, even had the arrangement been to sell the crops in common, and divide the money, this would not have been, within the law. of partnership, a sharing of profit and loss. A., owning a saw-mill, agreed with B. to work it and divide the gross earnings equally. Held, not partners. (Ambler v. Bradley, 6 Verm. Rep. 119.) Phelps, J. said, “They never shared in profit and loss. The share which the occupier received, was a mere compensation for his labor. This point has been often determined.” (Bowman v. Bailey, 10 Verm. Rep. 170, S. P. Vid. also Rich v. Penfield, 1 Wend. 380, 4, 5; and Loomis v. Marshall, 12 Conn. R. 69.)
A sale by joint tenants or tenants in common may be made before severance of the property, by all actually joining in the sale, or it may be made by one for the benefit of all, and, in the latter case, the sale being recognized and adopted by the others, becomes an original sale by all. (Per Daggett, J. in Oviatt v. Sage, 7 Conn. R. 99.) The consideration may then be said to move from all jointly, *240 whether tenants in common or joint tenants. (Ham. on Parties to Actions, p. 18, Lond. ed. of 1817. Vaux v. Draper, Sty. 156, 157, 203. Bell v. Chaplain, Hardr. 321. Bowman v. Bailey, 10 Verm. Rep. 170, 172.) If the defendant had taken the wheat tortiously, the owners, though but tenants in common, must all have joined in trover, or they might, according to the well known right of election in such cases, all have brought assumpsit for goods sold and delivered.(a) A fortiori may they do this, though the property have, in fact, been sold by one only.
*241 We have, so far, assumed that all the plaintiffs were common owners of the wheat. I have shown that Selam S., and H. S. Putnam, were properly considered, at least, common owners with Edward Putnam and Melendy. It is equally clear that all were also common owners with Farnam and Collins, provided the original contract was, in legal effect, a mere letting on shares. If a technical lease, they were not; and I do not see any evidence, independent of the *242 contract, which will make the ownership of the wheat common between the owners and occupiers. It therefore becomes necessary to examine the legal effect of the contract. Its words are in nearly the common form of a lease. The owners “have, and by these presents do lease and to farm let, all said land, to the said parties of the second part and in consideration, &c. the parties of the second part covenant with the owners, “to yield and pay and give to them one half of all the grain raised by them [the occu *243 piers] on said farm, to be delivered at,” &e. fixing the place.
The owners were to keep a certain number of sheep on the farm, to be fed by the occupiers, furnish plaister, one half the grain and grass seed, &c.: The occupiers to have one half the wool, and to deliver the other half on the premises in good order.
Various provisions were inserted, as to the mode in which the occupiers were to cultivate the farm.
There is no evidence which required the referee to say, that the wheat in question had been actually severed, so as to be known as that of the owners or occupiers. Oh the contrary, he was entitled to say on the evidence, and so doubtless he concluded, that the defendant purchased the wheat as that grown on the farm, and received it without any division having been made. That being so, if the "construction contended for by the defendant be correct, the alleged lessors were improperly made plaintiffs; and such a misjoinder will be fatal to this action.
The contract was under the seals of both the owners and occupiers, and if the right of the former to their share of the grain lay either in covenant simply, or in render, as it is technically called, they could take no present interest till severance and delivery at the place appointed. In such case the rule would apply, that so long as any thing remains to be done by the vendor, such as measuring, weighing, &c. the property in the goods sold does not pass. And, indeed, whether the property in the wheat had passed or not, the objection would be equally fatal to the action. If it had passed, each of the parties owned in severalty, and shoúld have sued for their respective shares. If not, the objection recurs, that the whole belonged to the occupiers, and adding the owners’ names was a misjoinder of parties.
Taking the words of this contract according to their technical meaning, there is no doubt that they carried, on the one hand, an exclusive possession and interest in the land to the occupiers, with a right equally exclusive to the *244 emblements. And had the rent consisted in any certain amount of grain and wool, in bushels or pounds, without saying from the farm, the owners .could have claimed no property in either till delivery, or at least till a tender made. The occupiers might have maintained ejectment, even against the owners, during the term, and put them to their action of covenant as. a remedy for their rent.
But it is insisted that, inasmuch as the shares of the owners ' t in the farm products were uncertain in amount, this made the parties tenants in common, at least in the productions thus to be grown and shared between them. That has been long and repeatedly held in respect to a letting on shares for a single crop. (Hare v. Celey, Cro. Eliz. 143. Spencer, J. in Foote v. Calvin, 3 John. 216, 221. Bradish v. Schenck, 8 id. 151. De Mott v. Hagerman, 8 Cowen, 220. Bishop v. Doty, 1 Verm. Rep. 37, and vide Chandler v. Thurston, 10 Pick. 205.) So for a single year, the share of the several crops to be1 measured and rendered by the occupier, on the premises. (Caswell v. Districh, 15 Wendell, 379.) In some of these cases, it was said there were not any such clear words of demise but that it was left open to pronounce the agreement general, to work on shares. It is obvious that the contract for the occupier to divide and render the owner’s share by measure on the premises, was meant for no more than what the law would require to be done in some form, at least what is commonly done, by way of severing the interest of common owners in personal property. The contract between the parties was therefore not allowed to operate as a lease, the court saying, in'some of the cases, that where the question is open, the construction more beneficial for both parties is, that they meant to hold in common. (See per Spencer, J. in Foote v. Colvin, 3 John. Rep. 216, 221, and especially per Nelson, J. in Caswell v. Districh, before cited.)
The sub-contract, mentioned in the report of the referee, between the Putnams, would come clearly within these cases, and, as we have sefen, make them tenants in common with the occupiers; for, though the first contract contain *245 ed a provision that it might continue for more than one year,, and the suh-contract was the same,' yet the provision was hut in the nature of a re-letting for the crop of the second year. Beside, although the cases seem to suppose, that in order to save the rights of the parties as tenants in common, the letting should be" for only a single crop, or, which is about the same thing in this country, a single year, it is difficult to perceive why the same form of contract for two or more years, would not continue the relation of tenants in common for the whole time. In Rich v. Penfield, (1 Wendell, 380, 384, 385,) the parties, owner and occupier, continued the working of a mill on shares for several years, and Sutherland, J. said he inclined to consider .them tenants in common.
But to show that the relation of the parties to the original contract was that of lessors and lessees, and the covenant to deliver the grain was but an agreement to render a share by way of rent, we are referred to the case of Stewart v. Doughty, (9 John. R. 108, 113.) There, the words of demise and covenant to pay a share of the crop, were almost literally, and clearly in legal effect, the same as here; and the contract was held to be a lease. The only difference was, in the length of the term. There, it was five years, with a right in either party to terminate it on six months notice; here, only one year, with a privilege in the occupiers to continue for another. The shortness of the term, I admit, may be evidence of an intent to hold the crop in common; but is that circumstance alone, able to overcome words of express demise and covenant to pay, which have a settled construction in the law? Had the covenant been to pay a fixed quantity, as 100 bushels of wheat, or two tons of hay, &c. though to come out of the produce of the farm, it seems to be perfectly settled that the lessor would have taken no present interest whatever. (Dockham v. Parker, 9 Greenl. 137. Vid. also Newcomb v. Ramer, 2 John. R. 421, in note.) And there is considerable authority, which does not appear ever to have been expressly repudiated, that a contract to render a moiety, especially *246 where the contract is for a certain term, or for more than one crop, amounts to the same thing. (Welch v. Hall, Bull. N. P. 85, Lond. ed. of 1788. Thompson and Livingston, Js., in Jackson ex dem. Colden v. Brownell, 1 John. R. 267, 270, 1. And see Hare v. Celey, and Stewart v. Doughty, before cited.)
Welch v. Hall, has long been disregarded, and probably never was law. It held that a contract on shares for one crop, amounted to a lease. What was said in Jackson, ex dem. Colden v. Brownell, went on the distinction between letting on shares for a single crop, and for a year certain. In the latter case, it was said to be a demise, because for a year, That view was overruled in Caswell v. Districh. In the latter case the contract was in words of demise for one year; not in the usual technical terms I admit, but clearly such as, at a money rent, would have been construed to mean the same thing. Yet the contract was denied to be a lease, and the denial put on the ground that the payment by way of rent was in moieties, to be measured and given by the tenant. Mr. Justice Nelson said, “ the shares were of specific crops to be raised on the farm,” and he adds—“ this view of the contract should be maintained, unless otherwise clearly expressed.” He thought the case distinguishable from Stewart v. Doughty, where the phraseology being that usual in leases, could not be got over by the agreement to pay in shares from the specific crops. With deference, I have not been able to make any substantial distinction in the phraseology. Independently of the fact that the render was confined to a share in the specific crop, it would, as appears to me, in both cases, have operated to make a lease. In Caswell v. Districh, the agreement was to let the defendant have the farm for one year. These, says Woodfall, are apt words to make a lease, (Woodf. Land, & Ten. 7, Lond. ed. of 1804;) and so it was adjudged in Whitlock v. Horton, (Cro. Jac. 91.) The words in Siewart v. Doughty rvere no more ; but if they were, Woodfall says, the most proper and authentic form of words may be overcome by a contrary intent ap *247 pearing in the deed of demise. (Woodf. Land, & Ten. 6, Lond ed. of 1804.) It seems to me therefore, that Stewart v. Doughty was very much shaken, not to say entirely overturned, by Caswell v. Districh; at any rate, that the question is open, whether the clearest words of present demise may not be considered as enuring to make a mere tenancy in common, under a letting like the one before us. And I am of opinion that they may. The compensation here lies wholly in shares from the farm products: in these, the owners are to be compensated for the use of their land, and the occupiers are to be paid for their labor. Indeed, as it respects the second year, from the crop of which the wheat in question was taken, the' words of letting are almost identical with those in Caswell v. Districh. But it is a case in which we ought not to tie ourselves up to the consideration of mere words. The substance should be looked at: and that, as it would be universally understood among farmers, is an agreement between owners and occupants, that the latter should come in rather as servants, than tenants; each party taking an interest as common owners in the crops and other products, as they accrue, by way' of compensation to the owners for the use of their farm, and the occupiers for their labor. (Vid. Maverick v. Lewis, 3 McCord, 211.) The extent of such compensation or interest, is to be collected from the contract. (Vid. Beaumont v. Crane, 14 Mass. R. 400.) This may be so framed as to secure an exclusive interest to the owner in certain products, such as the hay to be consumed on the farm; also -an exclusive interest in the young animals to be fed there, till they come to be distributed. No doubt, any provision of this kind may be made, if not in fraud of the occupant’s creditors. (Lewis v. Lyman, 22 Pick. 437.) But there being no such provision, a common ownership results in all products to be divided, in whatever form the provision „ may be for rendering or securing such products to either party. The true test seems to he in the question, whether there be any provision, in whatever form, for dividing the specific products of the premises. If there be, a *248 tenancy in common arises, at least in such products as are to be divided. The occupier being a mere servant, it is said, cannot bring trespass quare clausum fregit; but the owner only. (Hare v. Celey, before cited. Robertson v. George, 7 New-Hamp. R. 306,308.) His possession is that of the owner. (Id., and Maverick v. Lewis, before cited.) He has no interest in the land which he can assign, and, on his death, the contract would be at an end. (Id.) All these views seem ,to follow from Caswell v. Districh; and they are, some of them, ably Sustained by the late case in Massachusetts. (Lewis v. Lyman, before cited.) Other cases certainly take opposite views. (Weems v. Stallings, 2 Harr. & John. 365. Haskins v. Rhodes, 1 Gill John. 266.) And we have already seen, that even our own cases may be considered as somewhat in conflict. The more modern and maturely considered cases, both in this state and in Massachusetts, go, I think, clearly to sustain the right, both of the owners and occupiers, in the case before us, to be considered tenants in common. Though the whole be drawn up in the form of a lease, and a render as of rent, it is after all-but another mode of saying, that the occupiers shall work the farm for so long, and divide the profits with the owners.
It follows, that the purchase of the wheat by the defendant operated as a contract with all the plaintiffs, though it was .made with only one of them. And though the .whole transaction were conducted in his name, the evidence was quite sufficient to warrant the referee in finding that he acted as agent for his co-tenants.
■ The result is, that the motion to set aside the report of the referee should be denied.
Motion denied

 There is considerable difficulty in determining under what circumstances this right of electing between tort and assumpsit arises. Several English writers have stated the result of the decisions quite generally, thus—“ In many cases the law will raise a promise even from the wrongful acts of a party, and the plaintiff may waive the tort, and sue in assumpsit.” (1 Leigh’s N. P. 4, 5.) “ There are instances in which the law rases a promise ftom the acts of a party, and will not admit of evidence of his intention to commit a tort, in disavowal of such tacit promise.” (Ghitty on Gontr. 6.) Mr. Phillipps has been rather more explicit. He says —“ In some cases where goods have been wrongfully taken^the plaintiff may waive the tort and sue upon an implied contract as for goods sold and delivered.” He afterwards adds—“ It is not to be understood that an action of trover can be'converted into an action for goods sold and delivered, at the option of the plaintiff; the rule seems to be principally applicable to cases where the plaintiff has been induced by a fraud on the part of the defendant, to make a contract with the nominal party, ■of which the defendant has derived the whole benefit. (1 Phil. Ev. 110, 111, 1th ed. See also 3 Stark. Ev. 875, 6th Am. ed.) The main body of the decisions in England, on this head, will be found referred to by the books above quoted.
In Massachusetts, the right has been very much qualified. In Jones v. Hoare, (5 Pick. 285,) the plaintiff claimed to recover, as for goods sold and delivered, upon proofthat the defendant had tortiously entered upon the plaintiff’s land, and cut and carried away a quantity of timber therefrom; and the court held, that assumpsit was. not maintainable. “ There is no contract,” they said, “ between theparties, express or implied, and therefore an action ex contractu will not lie andit.was added—“ The whole extent of the doctrine, as gathered from the books, seems to be, that one whose goods have been taken from him, or detained, unlawfully, whereby he has a right to an action of trespass or trover, may, if the wrongdoer sell the goods and receive the money, waive the tort, affirm the sale, and have an action for money had and received for the proceeds. No case can be shewn, where assumpsit as for goods sold lay in such case, except it he against the exemtor of the wrongdoer, the tort being extinguished by the death, and no other remedy but assumpsit against the executor remaining.” The opinion of Strong, J. in the common pleas, (id. p. 285 et seq) which the court appear to have adopted *241 as the basis of their own, professes to review the English cases relied on as supporting the above conclusion, and notices various others, which in their dicta at least, seem contra. Further, as to the general doctrine in that state, with its qualifications, see Whitwell v. Vincent, (4 Pick. 449 ;) Miller v. Miller, (7 id. 133 ;) Bigelow v. Jones, (10 id. 161, 165 ;) Gilman v. Wilbur, (12 id. 120.)
In Pennsylvania also, the rule has been laid down with similar restrictions. Thus, where the plaintiff sued in assumpsit for a gun and horse, and he proved simply that the property was in the defendant’s possession, who detained it illegally under a pretended claim of title; held, that the action should have been trover. The plaintiff contended that he might waive the tort, and bring assumpsit. But the court said, “ this can only be done when the tort-feasor has sold the article, and received the money. In such a case, an action for money had and received may be sustained.” (Willet v. Willet, 3 Watts' R. 277.)
On the other hand, the superior court of New-Hampshire have repudiated this distinction. Accordingly, one having taken another’s goods without licence, held, that the latter might waive the tort, and sue in assumpsit as for goods sold and delivered; and this, though the case was determined on an agreed statement of facts, in which the plaintiff conceded that there was no contract_ the court construing the concession as meaning simply, that there was no express contract. (Hill v. Davis, 3 N. Hamp. R. 384. And see Chauncey v. Yeaton, 1 id. 151.)
In Maryland, the plaintiffs, as administrators, claimed to recover in assumpsit against one Joseph N. Stockett, for the work and labor of certain negroes, tortiously taken and held by him for a time, and then returned. The court allowed them to recover, on the ground, that they had a right to waive the tort. And Earle, J. delivering the opinion of the court, said, “ This right to waive the direct injury and adopt assumpsit, is universal, where the chattel taken has been turned into money. And it has been sustained in some instances, where the chattel has not been parted from by the trespasser. For the distinctions on this subject, vid. Hambly v. Trott, (Gowp. 375.) The present case, however, differs in its facts from most of the cases decided on this head. The negroes have been restored, &c. and the claim is for damages for the tort, committed by the trespasser in seizing them, and detaining them from the owner. That this kind of tort may also be waived, and an action sub *242 stituted for it, on the impEed contract, is fully established by the modem authorities, and is in fact in principle Eke the old cases reported on this doctrine. Lightly v. Clouston, (1 Taunt. 112,) and Foster v. Stewart, (3 Maulé <J- Selw. 191,) maybe consulted, and they will be found decisive on the point. The last was the case of an apprentice, seduced from the service of his master, where the seduction was waived, and an assumpsit, for the work and labor' of the apprentice, supported by Ld. Ellenborough, and the whole court.” (Stoclett v. Watkins' adm’rs, 2 Gill § John. 326, 342, 3.)
The above cases from the Maryland and New-Hampshire reports are sustained by the dicta of Jackson, J. in a Massachusetts case decided some time previous to Jones v. Hoar, supra, (Cummings v. Noyes, 10 Mass. R. 433, 435, 6.) And. see the observations of Maison, senator, in Butts v. Collins, (13 Wend. 153, 4;) also Ford v. Caldwell, (3 Hill’s R. (S. Car.) 248,) especially the opinion of Richardson, J. (Id. p. 250, et seq.) They seem also in accordance with the principle of several English decisions ; viz. that the tort-feasor shall not be aUowed, under such circumstances, to set up his own wrongful intent in disavowal of the implied promise which the law would otherwise raise against him. (Chitty on Gontr. 6. Hill v. Perrott, 3 Taunt. R. 274, 5, per cur. Lightly v. Clouston, 1 id. 112, 114, per Mansfield, C. J. 1 Leigh's N. P. 4, 5. Per Maison, senator, in Butts v. Collins, 13 Wend. 154, 5.) Apart from all reasoning of a technical or artificial character, and looking to the substantial ends of justice, it is quite difficult to see why this principle should not be applied in cases Eke Jones v. Hoar, and Willett v. Willett, supra. In neither, could the defendant have been prejudiced, by allowing the plaintiff to sue in assumpsit; on the contrary, the practice generaHy operates to favor the defendant, as the plaintiff thereby foregoes his right to damages for the tort as such, and restricts himself to the simple value of the property. (See per Lord Mansfield, in Lindan v. Hooper, 1 Cowp. 419; per Bayley, J., in Foster v. Stewart, 3 Maulé Selw. 201, 2; per Maison, senator, in Butts v. Collins, 13 Wendell, 156.) The defendant, moreover, gets the right of set-off, which would be precluded, by denying the plaintiff his election. (Per Heath, J., in Lightly v. Clouston, 1 Taunt. 114, 115.) Nor would the defendant he likely to suffer embarrassment by the form of pleading; (per Lord Mansfield, in Lindon v. Hooper, 1 Cowp. 414, 419 ;) and clearly he could not be said to incur any hazard from a second action in tort for the same matter. (See 1 Phil. Ev. 333, 7th ed; Rice v. King, 7 John. R. 20; McLean s.Hugaren, 13 id. 184.)