Mr. Justice WOODBURY
 

 delivered the opinion of the court.
 

 This is a writ of error, presenting three distinct grounds of exception to the judgment rendered in the court below.
 

 Neither of these is claimed to justify us in revising the finding of the jury on the evidence, though the verdict was not acceptable in some respects to the district judge who tried the cause, but should have been scrutinized by him, if at all, and, if clearly wrong, submitted to another jury for correction on the motion for a new trial. The exceptions to be now considered are, therefore, confined to the instructions given to the jury concerning the claims made in set-off by the original defendant, and are, that they all were, in point of law, incorrect.
 

 Those claims were, —
 

 1st. For commissions for drawing bills of exchange.
 

 2d. For commissions on payments made to mechanics and laborers at the navy-yard at Pensacola.
 

 3d. For loss of commissions on sales of slops, and loss by depreciation of property in the Pacific.
 

 The claim for commissions for drawing bills of exchange is founded on such service; performed at times from May, 1827, to February, 1S30. But it appears that such commissions were not, at any period, usually allowed, to permanent pursers. And though one or two instances were given of such allowances under peculiar circumstances, they were limited
 
 *102
 
 to that number; and on the 10th of November, 1826, commissions to commanders of squadrons, and “ officers of any grade,” for drawing such bills, were expressly abolished. (Red Book in the Navy, p. 10 and p. 27. See. also Letter of 4th Auditor, 26th June, 1844; Circular, 1st April, 1833.)
 

 'When the present claim was presented to the department by Mr. Buchanan, in 1831, it was, therefore, rejected, and seems to have been abandoned by him for nearly ten years after, when, another difficulty arising as to other transactions of his in the Pacific, this claim was revived, and offered in set-off to a suit by the government for moneys then -recently advanced to him.
 

 On what ground, thén, could the district judge properly "leave its allowance to the jury, as he did at the trial in this case ? It seems to us, that he should have instructed them that,- in point of law, neither any act of Congress, nor any regulation of the department, justified the allowance; that the service performed was an- ordinary one, connected with a purser’s official duties, and consequently, for which, in point of law, he was entitled to no extra compensation by way of commissions or otherwise. (See Gratiot
 
 v.
 
 United States, 4 How. 112.)
 

 The two cases, often relied on to justify such an allowance, were both claims for what was deemed by the court extra service. (United States
 
 v.
 
 McDaniel, and United States
 
 v.
 
 Fillebrown, 7 Pet. 16 and 28.)
 

 On the subject of a usage or custom, attempted to be proved, to overturn these principles and decisions, it seems to us that the judge should have ruled, that a usage ought not to be permitted to be set up, where a rule, as here, is not doubtful, but settled. (Brown
 
 v.
 
 Jackson, 2 Wash. C. C. 24; 6 Binney, 417.) And that a usage or custom, when admissible, must, in order to be valid, be ancient, reasonable, and generally known, (3 Wash. C. C. 149,) and also be certain (United States
 
 v.
 
 Duval, Gilpin, 372). Consequently, when it appeared here that the compensation was fixed or clear, and when it appeared that only one, or, at the furthest, two extra allowances could be proved of commissions for such services by permanent pursers, and those under peculiar circumstances, he should have directed that, in point of law, these last did not constitute a valid usage or custom, and that there was nothing properly to be left to the jury on the subject. In the United States
 
 v.
 
 McDaniel, 7 Pet. 16, the ugage had existed uninterruptedly for fifteen years.
 

 There is a very good description of a custom or usage in ch. 1, art. 3, of the Civil Code of Louisiana: — “ Customs result
 
 *103
 
 from a long series of actions, constantly repeated, which have, by such repetition and by uninterrupted acquiescence, acquired the force of a tacit and common consent.” How imperfectly the evidence in the present case meets the requirements of such a definition as this, or of any legal view of a valid usage, is so obvious as not to need further explanation.
 

 The second claim, for paying mechanics and laborers at the navy-yard at Pensacola, from 1835 to 1837, stands in a similar condition. It was a service expressly imposed on a purser of a yard as official, by the Blue Book of the navy, as early as 1818 (p. 14).
 

 But the judge instructed the jury, that this book had ceased to be in force. In this he erred. For the Navy Department, in 1831, had expressly and officially published, that it was still
 
 “
 
 in full force,” except in two or three other particulars, specified in a note to the-Red Book (p. 49, nóte). The latter, also, was then first printed, and not only did not profess to repeal the former, but such was not its legal effect. The Blue Book related chiefly to other matters than what were in the Red Book, and which were as necessarily to remain regulated by the former after the publication of the latter as before, and even now as then.
 

 The Blue Book concerns the complement of officers and men for vessels of different sizes, the duties of those officers .on shipboard and. at yards, salutes, recruiting, &c.; and not, like the Red Book, relating to decisions in the civil administration of the department, and circulars, orders, &c., connected with it.
 

 The latter was a mere collection of these latter matters, before existing dispersed and in manuscript; and being compiled and printed for the benefit of navy officers, as well as the department, the date- of each decision and circular was given, so that officers might see, if decisions, regulations, or circulars conflicted in any degree, as they sometimes might, which was of most recent date,'and consequently often modifying or superseding one made earlier. The Red Book introduced nothing new into the service, nor professed to do it, but merely arranged and made more generally known by printing, in 1831, what had before taken place on the matters described in it, as had been done in relation to some matters in the Blue Book, by printing and distributing that in 1818, as well as compiling and publishing in .that other things new and permanently useful.
 

 There being, then, no repeal of this part of the Blue Book relating to the duties of pursers at yards, the payment of
 
 *104
 
 mechanics and laborers stood, as ever since 1818, if not longer, an official duty of pursers stationed at them.
 

 The idea of attempting to set up a usage to pay commissions for this service, and leave merely one case of the kind to the jury as evidence of such a usage, was altogether untenable on sound principles, as before shown under the first claim. All the other cases referred to in support of such a usage or custom were not cases to allow commissions, though sometimes to sanction a sum of money for a clerk.
 

 But even this last had been abolished as early as 1826, long before the service performed by the original defendant, and only an additional steward had been since allowed at yards where the workmen were numerous. (Red Book,
 
 52.
 
 See Letter of 4th Auditor, June 26, 1844, and Circular of 1st April, 1833.)
 

 There is, likewise, another defect in the .instructions to the jury on both of these points, in permitting the testimony of naval officers, and sometimes of subordinate ones, rather than the head of the department, to go to the jury to enable them to decide what were and were not official duties, when it was rather the province of the court, after being duly informed from proper sources, to settle that as a question of law, and direct the jury upon it. (4 How. 80; 6 Binney, 417.)
 

 The third ground of claim, and the instructions upon it, are in some respects different, and remain to be considered.
 

 This claim was for commissions lost on the sale of slops and for depreciation in property, caused by orders of Commodore Claxton in the Pacific in 1839.
 

 The latter, finding that an unusual quantity of some kinds of clothing had been issued by the defendant from his private stores, on which an advance of twenty-five per cent, had been charged, and only a small quantity from the public stores, on which only ten per cent, advance was charged, interposed and issued an order against taxing the crew over ten per cent, advancé on certain articles of wearing apparel, on which the defendant insisted he was entitled to twenty-five. This claim is for a loss of the difference between ten and twenty-five per cent, on what was and hiight have been sold, and loss by depreciation on articles not sold. Considering the views entertained by this court on the impropriety in law of allowing this claim to be put in at all in set-off to this action, it is not necessary to decide here which percentage was the proper one.
 

 On the one hand, the opinion of the Commodore was sustained by that of Mr. Paulding, then Secretary of the Navy, — presumed to be best acquainted with the previous construe
 
 *105
 
 tions in the Navy Department, — and by the -express language of the Blue Book (pp. 103 and 105), and by some early decisions published in the Red Book (p. 18), as well as by the views of some of the members of this court; yet other constructions of these decisions tend to sustain the claim, as do the views of. other members of this court.
 

 Whichever of these constructions, then, may be correct, is not now settled, because we think it clear, that such a claim as this is not allowable at all by way of set-off to an action brought by the government.
 

 The statute of March 3d, 1797, which allows set-offs, has had a very liberal construction by tiffs court, expending it to matters even distinct from the cause of -action, if only such as the defendant is entitled to a credit on, whether equitable or legal. (United States
 
 v.
 
 Wilkins, 6 Wheat. 135; Ripley
 
 v.
 
 United States, 7 Pet. 25.)
 

 The object is to settle between the parties their mutual
 
 accounts or debts.
 
 (See the Act of Congress.)
 

 But any wrongs or torts done, and any unliquidated damages claimed, have never been permitted as a set-off. (Butts
 
 v.
 
 Collins, 13 Wend. 156; McDonald
 
 v.
 
 Neilson, 2 Cow. 140; Heck
 
 v.
 
 Sheener, 4 Serg. & Rawle, 249; 10 Serg. & Rawle, 14.) This rule prevails when the United States ar.e plaintiffs, as well as individuals. (United States
 
 v.
 
 Robeson, 9 Pet. 325.)
 

 Much less could wrongs done by others than the United States, and for whom it would be a very grave question whether the United States were in law responsible, be set off, and unliquidated damages allowed.
 

 Such a transaction, whether sounding
 
 ex delicto
 
 or
 
 ex contractu,
 
 seems to be one between the two officers, rather than between one of them and the government. (United States
 
 v.
 
 Hawkins, 10 Pet. 134; 9 Pet. 319.)
 

 It is certain, that no action could technically be sustained against the United States for any wrong done'here by Commodore Claxton. And, waiving their sovereignty to bar a suit, it is quite manifest that no claim exists as a matter of course against the government for a wrong done by one officer against another officer, or by one officer against an individual, when the liability of the officer himself for public acts is often questionable; and when the liability of the government for his acts, private or public, is still more in doubt. (Garland
 
 v.
 
 Davis, 4 Howard, 148, and cases there cited; Story on Agents, 412, note: Duncan
 
 v.
 
 Findlater, 6 Clark & Fin. 903, 910.)
 

 Nor does it alter the case,' if another officer, like a Secretary
 
 *106
 
 of the Navy, approves of the wrong. Should a post-captain go out of the path of his duty, or act beyond his legitimate authority, it appears on its face an affair between him and the sufferer, and not between the latter and the government.
 

 The defendant, if he has really been wronged by Commodore Claxton, acting against and beyond his official authority, has not only the usual modes of redress against him in the judicial tribunals, (Jones
 
 v.
 
 Bird, 5 Barn. & Ald. 837; 15 East, 384,) but it is gratifying to reflect, that resort to Congress is also open for relief, and with success, undoubtedly, should the defendant be able to satisfy Congress he was wronged by the Commodore, and that it is just and proper for the government to atone for any injury so done to him by another.
 

 But some legislative sanction to this claim, or some recognition by Congress of' a right to it, would seem an indispensable preliminary to its allowance in any form in the judicial tribunals against the government. See United States
 
 v.
 
 McDaniel, 7 Pet. 2 and 16.
 

 Judge Story in his work on Agents (■§ 319) says: — “In the next place, as to the liability of public agents for torts or wrongs done in the course of their agency, it is plain that the government itself is not responsible for the misfeasance, or wrongs, or neglects or omissions of duty, of the subordinate officers or agents employed in the public service.”
 

 This view is sustained by several adjudged cases, among which are the United States
 
 v.
 
 Kirkpatrick, 9 Wheat. 720, and 8 Wendell, 403; United States
 
 v.
 
 Vanzandt, 11 Wheat. 190; 1 Peters, 318; 5 Mason, C. C. 441; 15 East, 393; 6 Clark & Fin. 903.
 

 Consequently, the judge in the District Court erred in law by permitting a set-off, composed of such a claim, to go to the jury at all. There being error in the instructions on all the three claims, and the judgment in the Circuit Court having affirmed that in the District Court, it must be reversed and one entered disaffirming it, and the case remanded thence to the District Court, in order that there may be a
 
 venire de novo
 
 in that court, and another trial had in conformity to these views.
 

 Mr. Justice McLEAN and Mr. Justice GRIER dissented from the above opinion.
 

 Mr. Justice .WAYNE did not sit in the cause.
 

 Order.
 

 This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the
 
 *107
 
 Eastern District of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court', that the judgment of the said Circuit Court affirming the judgment of the District Court in this cause be, and the same is hereby, reversed, and that this cause be, and the same is-hereby, remanded to the said Circuit Court, with directions to enter a disaffirmance of the judgment of the District Court, and to remand this cause to the said District Court, with directions to that court to award a
 
 venire facias de novo,
 
 and for further proceedings to be had therein in conformity to the opinion of this court.