The opinion of the Court was delivered by
Bermudez, C. J.
This is an action brought against the State, with her consent, given by Act 82 of 1878, to recover $75,000 damages, for the alleged tortious construction of a levee.
From a judgment allowing plaintiff that sum, this appeal is taken.
The plaintiff claims to have suffered those damages in consequence of the manner in which the “ Bass Levee," in the Parish of East Carroll, in this State, was constructed by State officers, acting under Act 140 of 1877.
He complains that, towards the end of 1877 and the beginning of 1878, the State Board of Engineers and a contractor caused that levee to he located and constructed on the Mississippi river, in said parish : that, instead of running the lower line of said levee to the old levee, at, or near Ms plantation, at a designated point, which would have been perfectly safe and all that public necessity required, tlie State, through its said officers, has located and built the said line entirely in the rear of his plantation, below a certain point; thus, not only throwing out said plantation, hut obstructing the natural flow of the water hack into the bayou and swamps in the rear, and thereby causing the water to hack up and entirely overflow his plantation, which, from *495 its peculiar positiou, is uot otherwise liable to inundation, and has not been overflowed for a quarter of a century, producing large crops of corn and cotton.
He further charges that his rights have been invaded; that the location and construction of said levee, in the rear of his plantation was illegal and unnecessary to secure the country from overflow, and that whether necessary or not, the State had no right to obstruct the natural flow of the waters and cause the consequent inundation, damage and almost total loss of his large and valuable plantation, reducing him from comparative wealth to poverty.
The State pleaded the general issue.
The fact of the building of the levee between the points mentioned in the petition, and the amount of loss sustained in consequence of the overflow, appear to be well established, so much so, that it seems to be conceded that, if the plaintiff is to recover at all, he is entitled to the whole amount of damages claimed.
The question presented is one of great magnitude to the State and to the people.
It is simply whether the State can be held liable for the omissions of her officers acting in furtherance of law, in spite of the remonstrances of a citizen alleging consequent injury.
Por a proper consideration and solution of the question, it is necessary to divide it and to inquire:
1. Whether the State has the right to determine the propriety, location and mode of building of levees on the banks of navigable rivers within her territory, and whether, after she has so decided and has contracted therefor, a citizen on whose land the levee is to be built, can require It to. be constructed differently.
2. Whether, in case of non-compliance with his demand, by the officers in charge of the work and of damages thereafter sustained by him, he can hold the State liable for the injury thus suffered.
I.
There exists an implied assent on the part of every member of society, that his -own individual welfare shall, in cases of public necessity, yield to that of the community, and that his property, his liberty and even his life shall, in certain cases, be placed in jeopardy, or even sacrificed for the public good.
Hence it is, that a private mischief is to be endured, rather than a public inconvenience or calamity, and that in such cases, individuals sustain injury for which the law gives no redress. Blackstone Com. 21 Ed. 138, 139; Grotius, B. 3, C. 20, S.7, § 15 Mortes 9, Esp. deslois, lxxvii, Ch. 23; 1 Hale P. C. 54.
*496 The great purpose for which men live in a state of society is to secure’ their life, their liberty, their property and the pursuit of happiness. Those rights are unalienable, when they have not been abridged by some public law enacted for the benefit of the whole,
“ It is a settled principle,” says Chief Justice Shaw, (7 Cush. 53 Mass.) “growing outof well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, All property is derived directly or indirectly from, the government and held to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations as the legislature, under the governing and controlling power of the Constitution, may think necessary and expedient.”
This is very different from the right of eminent domain, which expropriates upon indemnity for public utility. It is the police power which is inherent to every government under its organic law, and which is exercised without making compensation. What damage or injury is occasioned by the exercise of such power is damnum absque injuria.
Vattel says, Sec 1, C. xx, $ 244: Le droit qui appartient a la soeiété ou an souverain de disposer en cas de nécessité et pour le salut public de tout bien renfermé dans l’État, s’appelle Domains éminent. Ce droit fait partie du souverain pouvoir. Domat Loix Civiles, 1. 1, t, 11, s. xiii. 432, et seq. Ordinance of Philip le Bel of 1303.
This absolute power of the State over the property of its citizens or subjects seems to be conceded by all writers and to be declared under all systems of governments. Differences exist, however, as to the right' of compensation in somecases. Sedgwick on S. & C. L., Ed. 1857, pp. 499, 533; Cooley, C. L,, C. XVI, pp. 713,714, 715, 731 andnotes ; Rowe on Inter-State law, p. 246 : 7 Cush. 53, 82; 10 Pet. 662, 737 ; 3 How, 212; 7 Greenleaf, 292 ; 27 Vt. 149 : 7 Cow. 351.
There are cases where it becomes necessary for the public authorities to interfere with the control by individuals, of their property, and even to destroy it, when the owners themselves have fully observed all their duties to their fellows and to the State, but where, nevertheless, some controlling public necessity demands the interference or destruction. Strong instances exist where it becomes necessary to take, use or destroy the private property of individuals, to prevent the spreading of a fire, the ravages of pestilence, the 'advance of a hostile army, or any other great public calamity. Neecessitas publica major est quam prvoata. Cooley, C. L., p. 746, and authorities in note.
The laws passed for such purposes, it is well settled, though they *497 may disturb tlie enjoyment of individual rights, are not unconstitutional, though no compensation is made. They do not appropriate private property for public use, but simply regulate its enjoyment by the owner. If he suffers injury, he is compensated, in the theory of the law, by . sharing in the general benefits which the regulations are intended or calculated to secure. Those regulations rest upon the maxim : Salus populi suprema lex. Dillon on Mun. Cor., 210 and note, et setp
Lord Bacon tells us in his Essays (of Judicature) that Judges ought, above all, to remember that conclusion of the Roman twelve tables, and to know that laws, except they be in order to that end, are but things captious and oracles not well inspired.
The Legislature, as the authoritative representative of the public and the constituted judge of what is demanded by the general weal, has the right to say to every proprietor: “ the public needs of your property so much,” and the individual must submit. * * It is a tremendous power and one which is without theoretical limits, and, indeed, without any legal limitations, except such as may exist in written organic restraints upon legislative action. Dillon, 453; Sedgwick, 499.
Private property may consequently be taken for public use, in the exercise of the general police powers of the State, without making compensation therefor. Dillon, 455, 864, § 756, and note with authorities, § 758.
It is upon those solid foundations that the Article of our Code was made to rest, which declares:
“ Servitudes imposed for the public or common utility relate to the space which is to be left for public use by the adjacent proprietors on the shores of navigable rivers and for the making and repairing of. levees, roads and other public or common walks. All that relates to this kind of servitude, is determined by laws or particular regulations.” C. C. 661; 665 R. C. C.; also Act 1829, Eeb. 7, § 3, p. 78, and the laws as compiled in the several revised Statute books hereafter mentioned.
In the early days of the State, the levees were made and kept in repair at the joint expense of the front proprietors. The law and clauses in the original grant burdened those who were contiguous on the river with the construction and repair of the road, ditches, bridges, and the levee. 6 Mar. 235; 2 A. 329 ; Martin’s History; what Dumont says in 1728; Gayarré’s History, v. ii, p. 2; Ordinance of O’Reilly, Feb. 18, 1770.
The duty was subsequently imposed upon police juries, who were vested with all necessary powers for the purposes. Rev. Stat. of 1852, p. 507; 1856, p. 481 ; 1870, p. 589.
In 11 A. 167, this Court said; “ To reconcile the controlling interest *498 of tho public with the subordinate interest, of the individual, is ever a delicate problem. When they come in conflict, the latter must yield. The safety of the public has first to be consulted. The law concerning tho expropriation of private property for public use, does not apply to such lands upou the banks of navigable rivers, as may be found necessary for levee purposes. Tbo quantity of land to bo taken for such purposes, presents a question of police, or administration, tobe decided by tho local authorities, whose decision should not be revised except for tho most cogent reasons, and when there has been manifest oppression or injustice.
Referring to the levee Act of 1829, in 12 A. 659, the Court also said: “ Tiie object of the Act is apparent. It is a matter of piublie necessity to shelter the inhabitants against inundation. As the property would be of no value without tho levee, the legislature had the power to compel such riparian proprietors to make thoso levees and roads in front of their plantations, without further compensation than the increased value which such works would confer on their lauds.”
In 2G A. 559, it was said : “ The building of levees in Louisiana is a public enterprise, or work which concerns at least half of the peopile of the State and, incidentally, the whole State. Of the propriety of constructing' levees, the general assembly is the exclusive judge, because we find in the Constitution no limitation upon the right to exercise the power.” Cooley, p. 589.
Under our law, tho banks of a river are understood to be that which contains it in its ordinary state of hig'h water. Where there are levees established according to law, the levees form the banks. R. C. C. 457. Works and buildings on the banks of a liver may bo destroyed, notwithstanding opposition by tho owner. R. C. C. 861.
When, by the mutation of their banks, navigable rivers reach the land of a proprietor, he continues to be subject to all the legal servitudes impiosed upon riparian owners. Houses and works on land thus brought under such a servitude, must, like the land of which they form p>art, be yielded upi to piublic service, without compensation, for their demolition is the act, not of man, but of God and the law. Such buildings cannot always obstruct the bank, although they may remain there until destroyed by time, accident, nature, or the owner. This would seem to be a logical sequence of Article 862, R. C. C.
In such cases, the owner is not absolutely expropriated. In case of the formation of a batture, where the river had encroached, and of the removal of the leveo to a point nearer the water line or bed of the river, the land recovered having continued to be, or having become, the property of the ripiarían owner, would be subjected to the exercise *499 of all the rights of absolute ownership over it, contingent on the renewal of the State police prerogative.
It is clear that, upon these sound principles which have been and are universally recognized and enforced, particularly here, the State had the undoubted right, in furtherance of public good, to pass and to execute levee laws, as she has done, specially that of 1877, under the liberal operation of which, the work complained of was reported upon, advertised, contracted for and completed, for the prevention of a great public calamity. 16 Ivans. 578.
The powers which the State possesses necessarily must bo exercised by agents, arid are transmissible to them by the State. Where, therefore, the State has the legal right to undertake a public work, the execution of which is likely, unavoidably, to entail private injury, the State has the right, as a corrollary, of delegating the power to agents, who then are clothed with the necessary incidental authority to do that which the State herself primarily had the right of doing. No injury, wrong, or damage, can be done, or can result, for the commission of an act authorized by law, and, therefore, none can be recovered. Lex neminem ledit. 1 Cal. 462 ; 4 Cal. 81.
The Act of 1877 is legal and constitutional, being prohibited by no organic law.
It makes it the duty of the Board of Engineers, which it creates, to make a careful survey of all the public- levees of the State as soon after the subsidence of high water as practicable, in order that contracts for work may be let out at the earliest possible moment, and to report to the Governor the extent of the repairs necessary, and of levees to be constructed, which are of prime importance to the State at large, and beyond the means of parochial authorities, furnishing estimates and specifications.
The Act further provides that, upon the receipt of the report, the Governor shall advertise for proposals to make the levees, or repair them, as may be recommended, and shall award the contracts therefor to the lowest responsible bidders.
It is not disputed that the formalities required by law, as conditions precedent to the giving out and execution of the work, were complied with j neither is it contended that the plaintiff interposed any objection to the awarding of the contract, after advertisement, for the construction of the levee In question. But it is insisted that, at an additional expense of 817,000, which the plaintiff offered to pay, the levee could have beeu constructed so as to save him ; that the engineers, in determining the line upon which the levee should be built were guided solely by consideration of what, in their judgment, was of the greatest benefit to ike State at large, without regard to private interests, and that, upon *500 representations and offers of plaintiff, tlie Board consented that the lino might be changed without expense to the State; but, meanwhile, the work of constructing the levee was under contract and in progress, so that it was essential that the contractor should become a party to any arrangement for a change, and plaintiff, failing to make such arrangements, the levee was finally completed upon the location as originally fixed.
It cannot be doubted that the Board of Engineers was a public political organization, created for a great public enterprise, clothed with extensive powers of inquiry, discrimination, and quasi judicial discretion, for purposes of determination and execution. It is not disputed that they exercised their judgment and entered upon the work complained of, only after full compliance with all legal requirements and after a contract had been formed by the executive, and which was binding on the State, for the execution and completion of the work. It is not shown that they were guilty of any oppression or injustice, or malice. Qui jussu judiéis aliquod feoerit, non videtur, dolo malo feeisse quia parere necesse est. Actus non fheit ream, nisi mens sit rea. Cooley on Torts, pp. 379, 410; Meeks on Damnum, Absque Injuria, $ 50, p. 63.
On the other hand, it is apparent that, if the plaintiff had occasion to complain, he has failed to make his causes of complaint seasonably known. There is nothing to establish that, ready as he says he was to pay $17,000, to have the levee constructed differently from what it was, he has, in the least, exerted himself to oppose the report of the engineers and the awarding of the contract; that he used any portion of said sum to protect, by some work, that portion of his plantation which was left out of the levee and which was subsequently so seriously injured. It may well be that had he interposed timely objections to the report, or to the giving out of the contract, the Board might have altered their plans and had them to conform to his suggestions. He permitted the contract to be awarded and afterwards failed in undertaking to accomplish an arrangement with the contractor. Por such omissions and derelictions he cannot, in equity, be permitted to blame the State or her officers, but must lay reproach at his own door.
It may well be that, had til© Board disregarded the provisions of the law and been guilty of manifest oppression, or injustice, or malice, he would not have been without remedy. His silence and inaction, when he should have spoken and objected, amount to a tacit approval and acquiescence of the contemplated work.
So that it is apparent that, while the State officers must be credited with efficiency and a desire to promote public good and subserve private interest, the plaintiff has not relieved himself from the imputation of lamentable and fatal laches.
*501 n.
It was not shown that the civil engineers and the contractor have deviated, in any respect, from the line which they were to follow for their conduct, under the law. On the contrary, it was established that the. work was done after compliance with all the requirements prescribed by the Statute, as conditions precedent. Were it not so, how could the State be held liable on account ox any of their acts, particularly where they had no authority to alter the proposed construction.
It is remarkable that the law upon which rest all actions for the reparation of injury sustained, wisely provides to the extent only, that:
Every act of man, that causes damage to another obliges him, by whose fault it happened, to repair it.
It does not include the sovereign, the State, who, as a rule, cannot be sued. The maxim is rex non potest pecewe. In such cases, the rule respondeat superior, does not apply.
This is so true, that no action can be brought against the State without her permission, that her consent had to be obtained and was given to authorize the present suit.
The consent to be sued does not at all imply an admission or a confession of liability. It is a mere act of grace which does not relieve the plaintiff from the obligation of making out his case, both in fact and in law. 33 A. 498.
By permitting herself to be sued in this case, the State merely consented to submit to a court of justice the question of her liability under the facts and propositions presented by both the plaintiff and herself. Otherwise, upon the consent of a State to' be sued, judgment should at once be entered up against her as upon a confession. The Court is called upon to determine the issues presented, not, however, as though the same were submitted between individuals on both sides; for individuals do not enjoy the rights, privileges, prerogatives and attributes of a sovereignty. We are to decide the differences between an individual, a citizen of the State, bound to submit to. her constitutional laws and the State herself; and, in so doing, to determine whether or not the State had a rigid to legislate as she has done, and to cause the work complained of to be accomplished in the manner in which it was, and whether, by not conforming with the wishes and by not submitting to the representations of plaintiff, and carrying on and completing the work as contracted for under the law, the Board of Engineers have imposed upon the State the responsibility and liability in damages which is sought to be fastened upon her.
We have stated what the police powers of the State are ; that they could have been exercised as was proposed by the Act of 1877, and that the execution of that law could saddle no responsibility.
*502 Indeed, no act- of omission or commission of tlie Board of Engineers and contractor, viewed as public officers, clothed with a quasi juilidal character, could impose a liability on the State.
“ It is plain,” says Judge Story, “ that the government itself is no! responsible for the misfeasances or wrongs, or negligences, or omissions of duty, of the subordinate officers or agents employed in the public service; for it does not undertake to guarantee to any jiersons the fidelity of any of the officers or agents whom it employs, since' that would involve it in all its operations, in endless embarrassments and difficulties and losses, which would be subversive of public interests, and indeed laches are never imputable to the government.” Story on Agency, No. 319; 8 Wend. 403, 422; 9 Wheat. R.720, 723; 4 Tenn. R. 796; 11 Wheat. 185; 8 How. 106.
The dilemma seems irresistible in this case: Either the Board of Engineers, the public agents of the State, have acted within the scope of their mandate and authority, of they have not.
If they have, then as they have carried .out a valid law, neither they nor the State can be held responsible.
If they have acted beyond that scope, their principal cannot be made responsible for their unauthorized act, and they alone are chargeable.
In 1874, a case somewhat similar to the one at bar was presented in California, and the Supreme Court of that State held substantially as follows: ,
It is within the police power of the State to authorize the channel of a river to be turned or straightened, in order to protect from threatened inundation a populous portion of the State, and such work is of a public character.
The bed of a river is a- public highway of the State and within its absolute control, subject to the rights of commerce.
A Board of Commissioners appointed by an Act of the legislature, with power thus to turn or straighten the channel of a river, are not liable for damages to others caused by the work, resulting from mere errors of judgment, provided they keep within the scope of their powers and exercise their judgment honestly, and do not act maliciously, oppressively or arbitrarily.
If the work done under the Act causes injury, the damage thus-sustained is not taking land for public use, and the Act is a sufficient defense to an action brought to recover from such loss. Green vs. Swift, 47 Cal. 541.
If, says Cooley, the State, under its power to provide and regulate highways, should authorize the construction of a bridge across a navigable river, it is quite possible that all proprietary interest in land upon the river might be injuriously affected, but such injury could no *503 in ore give a valid claim against the State for damages than could any change in the general laws of the State, which, while keeping in view the general good, might injuriously affect particular interests. P. 542. In support of such theory, he refers to the case of an authorized obstruction to the flow and reflow of tide waters, in which the Court said that if the co-terminus proprietor ■ suffers in consequence, it is damn urn absque injuria. 3 Cush. 91; 6 N. Y. 522; 13 Gray, 193; 14 S. & R. 71; 4 Pick. 464; 7 Greenleaf, 292; 4 Cal. 81; 1 Cal. 462.
In Prance it is a constant principle, on subjects like this,'that the State is not responsible for the consequences of public works. C. N. Sivey, Art. 1383, p. 658, §§ 124,125,126.
Indeed, how could the State be held liable, when citizens could not be subjected to indemnify loss sustained. J. P. 1813, p. 384; 1861, p. 888; Chardon droit d’alhivion, 345; Demolombe 11, No. 30; 30 A. 1359.
It is glaring that the burden of building the levee was upon the plaintiff; that the State was under no obligation to construct it; that she did so of her own motion for the protection of a large body of her people; that the plaintiff could still have built the levee which, he says, should have been constructed for the better security of his lands, crops, buildings and other property thereon; that he has not done so, and that what loss or damage he may have sustained is attributable, not to the State, but to his own abstentions.
We, therefore, conclude, that the State, in the exercise of her police powers, has the exclusive right to determine of the propriety, location and mode of building levees witlxin her borders ; that after she has so decided, and has contracted for the public enterprise, a citizen or riparian owner, on whose land the levee is about to be built, cannot effectually remonstrate and require that it be constructed differently, and that in case of non-compliance with his demand by the board of public officers in charge of the work, and in the event of subsequent damages sustained by liim, he cannot hold the State liable, either for compensation, as for property taken for public purposes, or for the injury sustained by him, in consequence of the destruction of the same.
There is error in the finding of the District Court.
It is, therefore, ordered and decreed, that the judgment ax>pealed from be annulled and reversed, and proceeding to render such judgment as should have been rendered.
It is ordered, adjudged and decreed, that there be judgment in favor of the defendant, the State of Louisiana, rejecting plaintiff’s demand, with costs in both Courts.
Levy, J., absent.