### UNITED STATES v. NORTH AMERICAN COMMERCIAL CO.

(Circuit Court, S. D. New York. April 27, 1896.)

1. REVISION OF STATUTES—CONSTRUCTION—REFERENCE TO PRE-EXISTING STATUTES.

The incorporation of a particular statutory provision into the Revised Statutes, adopted in 1874, was a legislative declaration that the law on that subject was as therein provided; and, in the absence of any obscurity in the meaning, the court cannot look to the pre-existing statutes to see whether or not they were correctly incorporated.

2. ALASKAN SEAL FISHERIES—REGULATIONS AS TO KILLING—POWERS OF SECRETARY OF TREASURY.

The act of March 24, 1874, amending the act of July 1, 1870, for the regulation and protection of the seal fisheries of Alaska, abrogated the provisions of the amended act restricting the number of seals to be killed, for a period of 20 years, on the islands of St. Paul and St. George, to 75,000 and 25,000, respectively, and conferred upon the secretary of the treasury full discretion to designate the number of seals which might be taken by the Alaska Commercial Company under its then existing lease, but entitled the lessee to a proportionate reduction of rent in case the secretary, during the 20-years term, should designate a less number than the original maximum, and, after the expiration of that period, left it wholly to the secretary to determine what number the lessee might take.

3. SAME—LEASE TO NORTH AMERICAN COMMERCIAL COMPANY.

The provision in the lease, executed March 12, 1890, by the secretary of the treasury, to the North American Commercial Company, whereby the lessee agreed to abide by "any restrictions or limitations upon the right to kill seals the secretary of the treasury shall judge to be necessary under the law for the preservation of seal fisheries in the United States," etc., bound the lessee, in the exercise of its exclusive right to take seals, to kill no greater number each year than was authorized by the secretary; and, in the absence of restrictions by him, its privileges were co-extensive with those of the previous lessee.

4. CONTRACTS WITH GOVERNMENT—DISCRETION OF PUBLIC OFFICER—RIGHTS OF CONTRACTORS.

Where a contractor with the government agrees to abide and be controlled by the judgment and discretion of a designated public officer, it is implied that such officer will not act arbitrarily or capriciously, but will exercise an honest judgment; and the contractor is entitled to the judgment of the particular officer named, and cannot be bound by the substituted judgment of any other authority.

5. SAME—LEASE OF ALASKAN SEAL FISHERIES—BREACH OF CONTRACT BY THE UNITED STATES.

The North American Commercial Company, having agreed by the lease of March 12, 1890, to be controlled as to the number of seals it might kill on the islands of St. Paul and St. George, by any limitations imposed by the secretary of the treasury, as necessary, in his judgment, for preserving the seal fisheries, the action of the United States in making with Great Britain the convention known as the "modus vivendi," and enforcing the same during the years 1891, 1892, and 1893, whereby the company

was entirely prohibited from killing seals, was a breach of the contract, and an invasion of the lessee's privilege, in the nature of an eviction, although the lessee availed itself of the privilege given it to take the skins from 7,500 seals which were killed under the direction of treasury department agents.

6. SAME—PROPORTIONATE RENTALS.

The lessee, however, by thus accepting a partial performance of the contract on the government's part, became bound to make a commensurate compensation.

7. CONTRACTS BY GOVERNMENT.

When the government enters into a contract with an individual or corporation, it divests itself of its sovereign character so far as concerns the particular transaction, and assumes that of an ordinary citizen, and therefore has no immunity permitting it to recede from the fulfillment of its obligations. Cooke v. U. S., 91 U. S. 398, followed.

8. SUITS BY UNITED STATES—SET-OFF—PRESENTATION AND DISALLOWANCE OF CLAIM.

The North American Commercial Company, as lessee of the Alaskan seal fisheries, having failed to present to the treasury department, for allowance, its claim for damages for alleged breach of the contract by the government, cannot, under Rev. St. § 951, set up such claim as a set-off to an action by the United States to recover rentals, and must therefore seek its remedy by a suit against the United States under the act of March 3, 1887.

This was an action by the United States to recover from the North American Commercial Company certain rentals alleged to be due under its lease of the Alaskan seal fisheries. The case was submitted to the court without a jury.

Wallace Macfarlane, U. S. Atty., and Max J. Kohler, Asst. U. S. Atty.

Carter & Ledyard, for defendant.

WALLACE, Circuit Judge. This is an action to recover rent for the year 1893 accruing under a lease executed March 12, 1890. By that instrument the plaintiffs, by the then secretary of the treasury, leased to the defendant, for 20 years from the 1st day of May, 1890, the exclusive right to engage in the business of taking fur seals on the islands of St. George and St. Paul in the territory of Alaska, and to send a vessel or vessels to said islands for the skins, and the defendant agreed to pay as annual rental the sum of $60,000, and $7.62½ for each fur skin taken and shipped, together with a revenue tax of $2 upon each skin; payment to be made on or before the 1st day of April of each and every year during the existence of the lease. The lease contained the following covenants on the part of the defendant:

"It also agrees to obey and abide by any restrictions or limitations upon the right to kill seals the secretary of the treasury shall judge to be necessary under the law for the preservation of the seal fisheries in the United States; and it agrees that it will not kill, or permit to be killed, so far as it can prevent, in any year, a greater number of seals than is authorized by the secretary of the treasury. It is understood and agreed that the number of fur seals to be taken and killed for their skins on said islands by the North American Commercial Company during the year ending May 1, 1891, shall not exceed 60,000."

The plaintiffs allege that the defendant, pursuant to the lease, took and shipped 7,500 fur seal skins from said islands during the year 1893, whereby there became due, by its terms, besides the $60,·

000, the sum of $72,187.50,—in all, the sum of $132,187,—which was payable April 1, 1894, and has not been paid. The defendant denies that during that year it took any seals from said islands, or shipped any skins whatever under the lease. It alleges that the secretary of the treasury did not limit or restrict the right of the defendant to take seals under the agreement during 1893 pursuant to the authority conferred on him by law to do so to the extent necessary for the preservation of the herd; that, prior to the 1st day of April, 1893, the United States entered into an obligation by treaty with the government of Great Britain whereby they engaged not to permit any taking of seals for their skins upon the said islands, and in order to perform the same prohibited this defendant from taking any seals for their skins at any time during that year; that by reason thereof the defendant could not, during that year, take any fur seals for their skins; that the prohibition was not necessary for the preservation of the seals upon said islands; that, by preventing the defendant from taking any skins under the agreement, the plaintiffs violated their agreement, and subjected the defendant to loss in the sum of at least $283,725; that, prior to the beginning of the suit, defendant duly presented to the accounting officers of the treasury for their examination its demand aforesaid; and that the same has been by said accounting officers disallowed.

The decision of the case requires a determination of the nature and extent of the rights and obligations of the parties under the lease, and whether, upon the facts, there has been an invasion by the plaintiffs of the contract rights of the defendant, whereby it has been deprived of the privileges to which it was entitled. The terms of the covenant which qualifies the exclusive right demised to the defendant of engaging in the business of taking fur seals on the islands are very comprehensive, and the present controversy is the outgrowth of a difference of opinion between the parties respecting its scope and effect. What was intended to be included in the general right granted to the defendant is manifest. It was, not the exclusive right of killing the seals upon the islands, or of killing any specified number of seals, but of engaging in what at the time was known as a business, a definite pursuit, which had been regulated by law and official supervision. By the acquisition of Alaska in 1868 the United States became the proprietor of the seal fisheries appurtenant to the islands of St. George and St. Paul. Those islands are the breeding ground of the herd which, in the early spring, moves northward to Behring sea, and are the habitat of the herd during the summer and fall. The seals land in great numbers upon the islands, dividing into families consisting of a male, or bull, and many females, or cows. The younger seals, or bachelors, are not admitted to the breeding ground, but are driven off and destroyed in great numbers by the bulls, and until they are three or four years old occupy other portions of the islands, passing through lanes out to and in from the sea at intervals. They multiply in such excess of the breeding requirements that a large proportion of them can be killed without diminishing the birth rate of the herd, and their skins are exceedingly valuable. By protecting the females,

and restricting capture to the bachelors, the fisheries are capable of a permanent annual supply of skins, affording a valuable source of revenue. The subject soon attracted the attention of congress, and by the act of July 1, 1870, a code of regulations was adopted, designed to protect the fisheries and secure a revenue to the government therefrom. This act made it unlawful to kill seals upon the islands or adjacent waters except during certain specified months, or to kill any female seals; regulated the manner in which the natives of the islands might be permitted by the secretary of the treasury to kill young seals for food and old ones for clothes; and prescribed penalties and forfeitures for violation of its provisions. The act also authorized the secretary of the treasury to lease to proper and responsible parties, having due regard to the interests of the government, the native inhabitants, and the protection of the seal fisheries, for a term of 20 years, the right to engage in the business of taking fur seals on the islands, at an annual rental of not less than $50,000, and at the expiration of said term, or the surrender or forfeiture of any lease, to make other similar leases. He was required, in making leases, to have due regard to the preservation of the seal fur trade of the islands, and to exact from lessees an obligation "conditioned for the faithful observance of all laws and requirements of congress and of the regulations of the secretary of the treasury touching the subject-matter of taking fur seals, and disposing of the same." The act also contained the following provision:

"Sec. 3. And be it further enacted, that for the period of twenty years from and after the passing of this act the number of fur seals which may be killed for their skins upon the island of St. Paul is hereby limited and restricted to seventy-five thousand per annum; and the number of fur seals which may be killed for their skins upon the island of St. George is hereby limited and restricted to twenty-five thousand per annum: provided, that the secretary of the treasury may restrict and limit the right of killing if it shall become necessary for the preservation of such seals with such proportionate reduction of the rents reserved to the government as shall be right and proper, and if any person shall knowingly violate either of the provisions of this section he shall, upon due conviction thereof, be punished in the same way as provided herein for a violation of the provisions of the first and second sections of this act."

Pursuant to this enactment, and in 1870, a lease was made by the secretary of the treasury for the term of 20 years, to the Alaska Commercial Company. That lessee, during the whole terms of its lease, was allowed to take annually the full quota of 100,000 skins, but during one year contented itself with taking only $75,000.

In the revision by Congress, in 1874, of the laws of the United States, the lease to the Alaska Commercial Company was specifically recognized, and the provisions of the act of July 1, 1870, were substantially reproduced. The revisers treated the act of 1870 as conferring authority upon the secretary of the treasury, after the expiration of the first period of 20 years, to prescribe the conditions of leases, except in respect to the length of term and the minimum rental; and they treated the provision in that act fixing the maximum take, and requiring a proportionate reduction of rent in case the secretary of the treasury should reduce it, as applicable only to the 20-year period ending July 1, 1890; and this would seem the natural and reasonable construction of that act. Whether that

construction was correct or not, the revision was the legislative declaration of the statute law upon the subject on and after the 1st day of December, 1873; and, in the absence of any obscurity in the meaning, the court cannot look to the pre-existing statutes to see whether or not they were correctly incorporated in the revision. U. S. v. Bowen, 100 U. S. 508. By act of March 24, 1874, congress amended the original act so as to authorize the secretary of the treasury to "designate the months in which fur seals may be taken for their skins on the islands of St. Paul and St. George, in Alaska, and in the waters adjacent thereto, and the number to be taken on or about each island respectively." The effect of this act was to abrogate the provisions of the pre-existing law by which, for a period of 20 years, no more than 75,000 seals could be killed on the island of St. Paul, and 25,000 on the island of St. George, and to confer upon the secretary of the treasury full discretion in the matter. Its manifest intent was to permit him to authorize more or less to be killed during that period, as well as thereafter. It repealed, by implication, so much of the Revised Statutes as was inconsistent with it, because it took effect as a subsequent statute, although later in point of time. Rev. St. § 5601.

Passed, as it was, by the same congress which, in the Revised Statutes, had recognized the existing lease to the Alaska Commercial Company, it must be presumed that the act of March 24, 1874, had that lease in contemplation, and was not intended to impair the vested rights of the lessee. Consequently it should be read as intended to remove the limitation upon the number of seals which might be taken by that lessee, relegate the designation of the number to the discretion of the secretary of the treasury, but entitle the lessee to a proportionate reduction of rent in case the secretary at any time during the 20-year term should designate a less number than the original maximum; and after the expiration of that period to leave it wholly to the secretary of the treasury, in the exercise of his discretion, to determine what number a lessee should be permitted to take.

The present lease must be read in the light of the existing situation when it was made, and as controlled by the laws relating to and authorizing it; and, as thus read, its meaning and the intention of the parties seem so clear that any reference to the preliminary proposal and bid is unnecessary. It was intended to secure to the defendant the exclusive right of taking the annual product of the fisheries, subject to the regulations prescribed by the statutes, and subject, also, to such further restrictions and limitations as the secretary of the treasury, in the exercise of his discretion, should deem necessary for the preservation of the fisheries. When restricted by the secretary of the treasury, the defendant was not to be entitled to kill a greater number of seals than authorized by him. In the absence of such restriction, its privileges were co-extensive with those of the previous lessee.

It is not unusual for a contractor with the government, as with other municipal bodies, to repose upon the good faith and discretion of some public officer who represents the government and is respon-

sible for the protection of its interests in the transaction. Such contractors frequently consent to stipulations by which the value of the contract is substantially controlled by the judgment of such an officer. In such contracts, however, it is implied that the public officer will not act arbitrarily or capriciously, but will exercise an honest judgment. Chapman v. Lowell, 4 Cush. 378; Kihlberg v. U. S., 97 U. S. 398; Bowery Nat. Bank v. Mayor, etc., 63 N. Y. 336. The party who has agreed to be bound by that judgment is entitled to have it exercised in good faith by the officer nominated, and cannot be bound by the substituted judgment of another authority. The defendant was willing to assume, as it was justified in doing, that a secretary of the treasury of the United States would not abuse the power with which the contract intrusted him; and if, by any legitimate exercise of that power, it had been disappointed in the fruits of the contract, it would have had no just reason to complain.

The contention, for the defendant, that the secretary of the treasury did not limit or restrict its right to take seals under the lease for the year 1893, but that it was prohibited by the government of the United States from exercising the right, and was thus deprived of the benefit of its contract, rests on the effect of the convention between the governments of the United States and Great Britain known as the "modus vivendi." By that convention the United States promised, during the pendency of the arbitration between the two governments relating to the Behring Sea controversy, and the preservation of the seals resorting to those waters, to prohibit seal killing on the islands in question "in excess of 7,500, to be taken on the islands for the subsistence of the natives," and to use promptly its best efforts to insure the enforcement of the prohibition. The events which led to the convention are matters of public history, and need not be recited. Undeniably, the preservation of the seal fisheries upon the islands was one of the objects which influenced it; but its adoption was not necessary for their preservation, except in the sense that the fisheries were likely to be destroyed by pelagic sealing, and without the modus vivendi pelagic sealing could only be suppressed by force and at the risk of war. It was adopted for the purpose of avoiding irritating differences, and to promote a friendly settlement between the two governments touching their rights in Behring Sea. There never was a time in the history of the seal fisheries when it was necessary, or even desirable, to limit the killing upon the islands to the number specified in the modus vivendi. As has been stated, the killing was always confined to the bachelor seals, and when thus confined did not cause any diminution in the annual product of the herd. The destruction of the herd was caused by the killing of the females on the high seas, while on their migration southward, by the pelagic sealers. The killing of 100,000 annually by the previous lessee did not perceptibly affect the supply; and it was not until 1890, when the inroads of the pelagic sealers began to threaten the ultimate extirpation of the herd, that it was materially affected.

By the adoption of the modus vivendi, and its enforcement by the government during the years 1891, 1892, and 1893, a situation was

created which was not within the contemplation of the parties to the lease. It seems to have been supposed by both parties when the lease was made that after the first year of the term, during which the defendant was to be limited to a take of 60,000 seals, the normal quota of 100,000 could probably be killed. Because this was the understanding, the secretary of the treasury, who was in office until March 4, 1893, acting upon the advice of the then attorney general, consented to accept of the defendant a reduced rental during the period of the modus vivendi in lieu of the rental fixed by the lease. Besides the rental, the defendant, by the terms of its contract, assumed quite onerous obligations. It agreed to supply the inhabitants of the island with coal, provide them with comfortable dwellings, establish and maintain schoolhouses, and a house for religious worship, provide them with competent physicians and necessary medicines, and also to provide the necessaries of life for the widows and orphans and aged and infirm inhabitants, all at its own expense. It would be preposterous to suppose that the defendant, or any other lessee, would have assumed the obligations of the contract had it been understood that the privilege leased was to be of such comparatively insignificant value as it proved. By the enforcement of the modus vivendi the defendant was prohibited from killing any seals. As appears by the diplomatic correspondence, the clause authorizing the killing of 7,500 seals upon the islands "for the subsistence of the natives," was inserted for the benefit of the defendant as well as the natives, with the purpose and expectation that, while the latter should have the meat, the defendant should have the skins as a pro tanto satisfaction of its contract rights. There is no evidence, however, that the defendant consented to or was consulted about that provision of the convention.

That the enforcement of the prohibition was a breach of the contract by the government does not seem to admit of doubt. It was an invasion of the privilege in the nature of an eviction. Notwithstanding the defendant was permitted, ex gratia, to receive some benefits from its contract, its privilege during the period of the modus vivendi was suspended and practically annulled. When the government enters into a contract with an individual or corporation it divests itself of its sovereign character so far as concerns the particular transaction, and takes that of an ordinary citizen; and it has no immunity which permits it to recede from the fulfillment of its obligation. As was said in Cooke v. U. S., 91 U. S. 398:

"If it comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there."

It will not do to say that the situation when the modus vivendi was entered into was such as would have justified the secretary of the treasury in limiting the quota to 7,500, and consequently that the defendant was not deprived of any substantial part of its contract. The assumption would not be true as a matter of fact, for the evidence is that 20,000 bachelors, and probably more, could have been killed upon the islands during 1893. Moreover, the defendant did not agree that the judgment of the government might be substituted for that of the secretary of the treasury in determining what

number it might be permitted to take; and to compel it to accept the substituted judgment would deprive it of the only guaranty contained in its contract for just and reasonable treatment. By the convention the secretary of the treasury was shorn of all power and discretion in the matter. He did not assume or attempt to fix the quota for 1893. All the seals taken upon the islands during that year were taken by the government itself, through the agents of the treasury department; but the defendant was permitted to co-operate in selecting the seals to be killed, and to take and retain the skins, apparently pursuant to an understanding with the secretary of the treasury. In this way, and in this way only, the defendant received 7,500 skins.

The defendant, having accepted a partial performance of the contract, must make a commensurate compensation to the plaintiffs. It might have refused to accept the skins, and in that case could have successfully resisted any claim for rental; but, having accepted some of the fruits of the contract, it cannot retain them without making a just remuneration. Tomlinson v. Day, 2 Brod. & B. 680; Smith v. Raleigh, 3 Camp. 513; Manufacturing Corp. v. Melven, 15 Mass. 268; Lawrence v. French, 25 Wend. 443; McClurg v. Price. 59 Pa. St. 420; Day v. Watson, 8 Mich. 536; Watts v. Coffin, 11 Johns. 499; Lewis v. Payn, 4 Wend. 423. It is quite impracticable, if not impossible, to determine the amount for which the defendant should respond, except by ascertaining the value of its privilege during the year in question, and adjusting the value of the partial benefit proportionally to that of the whole benefit it would have derived if it had been permitted to fully enjoy the privilege.

As has been stated, the evidence is that, if the defendant had been allowed to exercise its right to take the seals in the customary way, it could have obtained 20,000 skins. This number is less than the estimate of the experts, but the accuracy of their conclusions is somewhat impaired by the fact that a smaller quota was assigned to the defendant in 1894, after the termination of the modus vivendi. If it had taken 20,000 skins, there would have been due to the government, besides the $60,000 rental, a per capita payment of $192,500,— in all, the sum of $252,500. Upon this basis the contract value per skin would have been $12.62½, and for the 7,500 skins $94,687.50.

According to the evidence, the defendant could have realized, at the average market prices for 1893, the sum of $24 for each skin,— a total, for the 12,500 which it was prevented from taking by the act of the government, of $300,000; and the capture and marketing of the whole number would not have entailed upon the defendant any additional expense. There would have been payable, however, under the contract, the further sum, at the basis of $12.62½ per skin, of $157,812.50. Thus the defendant sustained a net loss, in consequence of the breach of its contract, in the sum of $142,187.50, for which it has a just claim against the government.

Notwithstanding the defendant's claim is one for unliquidated damages, it would seem to be a proper matter of counterclaim or credit, were it not for the fact that the conditions prescribed by section 951 of the United States Revised Statutes have not been complied

with by the defendant. Gratiot v. U. S., 15 Pet. 338; U. S. v. Wilkins, 6 Wheat. 135; U. S. v. Eckford, 6 Wall. 484; U. S. v. Ringgold, 8 Pet. 150. That section, which originated in the act of March 3, 1797, has received a very liberal construction by the supreme court, "extending it to matters even distinct from the cause of action if only such as the defendant is entitled to a credit on, whether equitable or legal." U. S. v. Buchanan, 8 How. 105. By that section, however, no claim for a credit shall be admitted, in suits brought by the United States against individuals, except such as appear to have been presented to and disallowed, in whole or in part, by the accounting officers of the treasury, unless it is proved that the defendant is in possession of vouchers not before in his power to procure, and was prevented from exhibiting his claim for such credit at the treasury by absence from the United States or by some unavoidable accident. It has not been shown that the claim has been presented to the accounting officers of the treasury, nor that the defendant has been prevented by any cause from making presentation. Consequently, the defendant must seek its remedy by a suit against the government, brought conformably to the provisions of the act of March 3, 1887. 1 Supp. Rev. St. p. 559.

It follows that the plaintiff is entitled to judgment in the sum of $94,687.50.